Irving O. COSBY, et al.,
Plaintiffs–Appellants,

v.

Sally WARD, Director of the Illinois Department of Employment Security of the Illinois Department of Labor, et al., Defendants–Appellees.

No. 86–1181.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1986.

Decided March 14, 1988.

Jeffrey B. Gilbert, William J. Martinez, Steven Coursly, Steven Saltzman, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs-appellants.

Patricia Rosen, Illinois Asst. Atty. Gen., Chicago, Ill., Jeff A. Hennemuth, Office of Sol., U.S. Dept. of Labor, Washington, D.C., for defendants-appellees.

Before WOOD, COFFEY, and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiffs are representatives of two classes of unemployment insurance claimants. They brought suit under 42 U.S.C. § 1983 against the Director of the Illinois Department of Employment Security (IDES), the United States Department of Labor (DOL), its Secretary, and the Assistant Secretary of Labor for Employment and Training, alleging that IDES's administration of two unemployment insurance programs violated federal law and the plaintiffs' due process rights under the United States Constitution. After the plaintiffs presented their evidence, the state defendants moved for an involuntary dismissal of the action under Federal Rule of Civil Procedure 41(b). The district court granted the motion and entered judgment against the plaintiffs who have appealed. We affirm on the statutory issues, reverse on the constitutional issues, and remand for further proceedings on the latter issues.

## I. FACTUAL BACKGROUND

The district court adopted the parties' eighty-seven-page stipulation of facts. We will do the same, providing only a brief summary drawn from the stipulations and

the district court's findings. *See Cosby v. Ward*, 625 F.Supp. 619 (N.D.Ill.1985).

## A. The Programs

Unemployed people in Illinois who are eligible for unemployment insurance are entitled to the lesser of either twenty-six weeks of regular benefits payments, or the total insured wages for a base period. Illinois Unemployment Insurance Act (IUI Act), Ill.Stat.Ann. ch. 48, ¶¶ 300–820. After these regular benefits are exhausted, the claimant may be eligible for payments under two other programs: the extended benefits (EB) program, or the federal supplemental compensation (FSC) program. The EB payments are made under the Federal–State Extended Unemployment Compensation Act of 1970 (EUC Act), 26 U.S.C. § 3304(a)(11), and IUI Act § 409, Ill.Stat. Ann. ch. 48, ¶ 409. Benefits under the program become available when unemployment in the state reaches a specified level. A claimant may receive up to thirteen weeks of EB payments.

After a claimant has exhausted both his regular benefits and EB, he may be eligible for payments under the FSC program. Federal Supplemental Compensation Act of 1982 (FSC Act), 26 U.S.C. § 3304 note. The maximum period for a claimant to receive FSC payments is from ten to twenty-six weeks. There is no requirement of a "trigger level" of unemployment as there is under the EUC Act.

Regular benefits are paid by the state from taxes collected from employers. The state makes EB payments also, but the federal government reimburses the state for fifty percent of the program's cost under section 204 of the EUC Act. The federal government pays all FSC benefits under the FSC Act, and also compensates states for the costs of administering EB and FSC programs.

In order to receive federal money, the state must comply with federal statutes and interpretations thereof by the DOL and Illinois has entered into a contract with the DOL, agreeing to abide by the FSC program rules. The EUC Act and the FSC Act require people claiming EB to actively search for work. They must provide the state with evidence of their search efforts. There is no statutory provision explaining exactly how a claimant can demonstrate compliance with these requirements.

After a claimant has exhausted his regular benefits, a claims technician at the local IDES office explains to the claimant that he may be eligible for further benefits. The technician gives each claimant a written notice about the programs and explains the notice. Many technicians are multi-lingual, and each office has technicians who speak the language of the local population. Notices about the programs, however, are written in English. Claims technicians give claimants form questionnaires to return every two weeks. The questionnaires ask for information about the claimant's search for work, and include such questions as "[w]hat is the lowest starting wage you will accept?" and "[h]ow long (in time) are you willing to travel each way to work?" These questions and answers are used to identify restrictions that the claimant may be placing on his work search. Claims that are clearly acceptable are processed for payment. Claims that raise questions about the claimant's restrictions are sent on to an adjudicator. When this happens, an employee of the local office will send the claimant a notice that he is to appear in person at the local office. Although this notice is also intended to inform the claimant of the problem, the district court found that "frequently it is filled out in such a perfunctory fashion that the claimant could not know why he had been summoned." 625 F.Supp. at 625.

The adjudicator discusses with the claimant his answers to the questionnaire, and decides whether the claimant has understood the questions and answers. If the adjudicator finds that the claimant misunderstood a question, the adjudicator may allow him to withdraw his original answer and supply a correct one. The claimant may even return home to retrieve additional documentation for his answers. The adjudicator will not, however, coach a claimant on acceptable answers, and once the adjudicator has determined that the claim-

ant's restrictions are unreasonable, the claimant can no longer "correct" his answers. At the conclusion of the interview, the claims adjudicator will render a written decision on the claimant's eligibility for benefits. If the claimant is found to be ineligible, he will be denied benefits for the two-week period covered by the questionnaire. Once denied benefits, a claimant is not eligible for benefits again until he has worked for at least four weeks.

A claimant who is denied benefits by a claims adjudicator may appeal that denial to a referee. Referees are lawyers who are independent of the vagaries of the local offices. The claimant may file written reasons for his appeal, and, when he meets with the referee, he may present evidence. If the claimant does not speak English, and the referee does not speak the claimant's language, IDES will appoint an interpreter. The hearing is recorded. After reviewing with the claimant his questionnaire and the meaning of the claimant's answers, the referee will make a new determination of the claimant's eligibility. He is not bound by the adjudicator's findings. The referee will file a written decision, which is more formal than the adjudicator's decision. The claimant may appeal this decision, if it is unfavorable to him, to the Board of Review.

The Board of Review is an administrative court within IDES. As a party may do in other courts, a claimant may file written briefs, personally or by counsel, arguing legal and factual questions. Unlike the referee, the Board may not disregard the previous findings, but instead makes its decision based on the record established before the referee. Decisions are not routinely published, but IDES maintains a digest of the Board's decisions both for its own purposes and for the public. A manual of benefits decisions also provides the public with access to some of the Board's decisions.

The last avenue for appeal is to the state courts. Ill.Stat.Ann. ch. 48, ¶ 520; ch. 110, ¶¶ 3–101 to –112. By the time this level of review is accomplished, however, many months will have passed.

Claims technicians, adjudicators, and referees all receive training from IDES on the nature of and criteria for the benefits programs. All of these people receive copies of the hundreds of bulletins that IDES sends out. Although they may not remember each specific bulletin, the district court found that "the technicians, adjudicators, and referees who testified were familiar with the general principles in the bulletins." 625 F.Supp. at 625.

In making their decisions on a claimant's eligibility for benefits, reviewers (claims technicians, adjudicators, referees, and the Board) have at their disposal two sources of information that they frequently do not use. One of these sources is a newsletter that IDES publishes through its Economic Information and Analysis Unit. This Unit collects information about Illinois labor markets and its newsletter contains data about the state as a whole, and in city and county segments. Information about smaller areas is contained in quarterly publications. The district court found that "the Unit does not determine whether there are openings in particular occupations, and none of the [reviewers] who testified made any use of the data disseminated by the Unit." 625 F.Supp. at 626.

Another potential source of information for the reviewers is the Job Service, the state agency that helps unemployed people find work. Registration with Job Service is a prerequisite to eligibility for any unemployment compensation. Claimants and Job Service counselors work together in devising for a claimant a plan to search for new work. Although the counselors presumably know where a claimant can look for work to suit his particular skills, they do not ensure that the claimant's plan complies with the work search rules used by the unemployment offices. Similarly, the approval by Job Service of a claimant's work search plan carries no weight with the administrators of the EB or FSC programs.

## B. State Implementation

Benefits under the EB and FSC programs are restricted by federal law to peo-

ple actively seeking work. To implement this law, IDES has issued to its staff several bulletins pertaining to the work search requirement. One such bulletin contains the following language:

> Due to the EB claimant's prolonged period of unemployment, it is intended that he be required to make a more diligent effort to seek work than would normally be required of an individual receiving regular benefits. Accordingly, the weekly eligibility of each EB claimant must be monitored in light of the special requirements concerning search for work....
>
> All EB claimants must be advised of the work search requirements that they must meet each week.... It is expected that the EB claimant's efforts to find work should increase because of the duration of his unemployment.
>
> If there are no or few openings in the claimant's customary occupation, he must broaden the types of work sought to meet the active search for work requirement. Claimants who restrict their job search to their customary occupation, or who have other restrictions (i.e., wages, hours, travel, etc.) not based upon physical or mental capability, and by these restrictions fail to maintain an active systematic search for work, may be ineligible for extended benefits.
>
> In determining whether the individual has met the active search for work requirement, where openings in the individual's customary occupation are few or nonexistent, the following areas shall be considered:
>
> a. Available Jobs—Hiring pattern
>
> b. Economic Activity—Labor market
>
> c. Claimant's physical and mental ability
>
> ....
>
> The level of economic activity in the labor market area and the kinds of work available are important factors in determining whether a systematic and sustained work seeking effort is being made. Eligibility Review Program and Job Service information and any job counseling interviews as well as the results of aptitude testing would be pertinent.

IDES Bulletin No. 1467, Supp. 1 (Aug. 20, 1981). The form that the claims technicians give to claimants includes the following information:

> You are expected to relax your restrictions with respect to the type of work you will accept, hours, rate of pay, travel time, etc. (for example: A senior accountant would be required to accept work as a junior accountant or bookkeeper, etc.)
>
> ... If there are no or few openings in your regular occupation, you are expected to seek any work within your physical and mental capabilities for which you have the background to perform....
>
> You may use your usual methods of contacting potential employers (in-person contacts, registration with private employment agencies, reporting to your union as required, answering or placing want ads, resumes, telephone calls, etc.,) [sic]. However, your work search must include some independent work search efforts each week.
>
> If you are not able to conduct an active search for work during a week due to compelling circumstances, you will be held ineligible only if you claim the week. It is your responsibility to inform the local office that you are not claiming a week for this reason....
>
> ... If you do not have a definite prospect to return to work in 4 weeks or less, your job prospect classification in [sic] "not good". If your classification is "not good", any work that is within your physical and mental capabilities that you have the background to perform is suitable, provided that ... the gross average weekly wage exceeds your weekly benefit amount (plus any supplemental unemployment benefits paid to you by a former employer)....
>
> If you fail to conduct an active search for work or you refuse to apply for or to accept suitable work ... you will be held ineligible for Extended Benefits for the week in which such failure occurred and for each week thereafter until you have worked in at least 4 weeks with earning

in each week, which when totaled, equals at least 4 times your weekly benefit amount.

Benefit Rights Information for Extended Benefits Claimants form.

When a claimant is ineligible for EB, either because the program is not in effect in Illinois or because he has exhausted his benefits, he may be eligible for FSC. The IDES issued bulletins with instructions for implementing the FSC program. The bulletins do not interpret the program's requirement that a claimant seek work actively, but there is no suggestion that the requirement has a different meaning than it does under the EB program.

Claimants seeking FSC benefits were given the following instructions for seeking work:

(1) On each normal working day you must do something positive to find work.

(2) ... You must make work contacts on at least 3 days per week, resulting in at least 5 employer contacts per week. This may mean looking for work beyond your normal commuting distance as well as increasing one-way travel time. You are expected to lower your salary demands, even to the minimum wage, if there are no prospects of finding work in your customary occupation.

(3) If there is any day in which you made no employer contacts, you must indicate on the form what positive effort you made that day to find work, for example, preparing a resume, contacting a union or a professional organization, attending an employment seminar, etc.

(4) If prospects for obtaining work in your usual occupation are poor (that is, if you do not have a *definite* offer to begin work within four weeks ...), you will be expected to accept any offer of suitable work that is listed with the State Job Service or offered in writing. Any work will be considered suitable if you are reasonably fitted by training and experience to perform the work or if the necessary training is provided when you lack the required skills.

To be suitable, the gross pay of any work offered must exceed your weekly benefit amount plus any Supplemental Unemployment Benefits (SUB) you receive from your former employer, or the State or Federal minimum wage, whichever is greater.

The law provides for denial of FSC to anyone who does not observe the above requirements. The disqualification will continue until the person has worked in at least four weeks and earned not less than four times his or her weekly benefit amount.

Important Notice for Federal Supplemental Compensation (FSC) Claimants form.

Although these notices to claimants did not elucidate bright-line rules for the conduct of their work search other than the requirements that a claimant must make five contacts with potential employers over at least three days of every week and that a claimant must accept any wage over the stated minimum, the plaintiffs claimed, and the district court found, that IDES used objective rules of thumb to determine claimants' eligibility for benefits. 625 F.Supp. at 629. These rules of thumb developed to help the reviewers evaluate claimants' questionnaires. Claims routinely would be denied if the claimant did not state that he would travel at least one hour each way for work. Similarly, a claimant must have said that he was willing to work on different shifts for at or near the minimum wage. A claimant also was required to visit employers in person. When claimants were questioned about their answers on the questionnaire, they had the opportunity to revise these answers. However, they did not know about the rules of thumb, and inadequate answers to the questions were used to demonstrate that they were not engaged in an active search for work.

Although adjudicators and referees testified at trial that the rules of thumb were not necessary to evaluations of claims, the district court found that the rules were rarely relaxed. *Id.* The court also found

that the reviewers would not "test" claimants' answers to items on the questionnaire, or use collateral methods to determine, for example, the distance claimants were actually traveling to search for work, or the wage claimants were requesting on job applications. The reviewers simply let the claimants disqualify themselves by accepting their answers at face value.

The district court found that IDES decisionmakers, despite the requirements in their own bulletins, did not use information about the labor market or job openings in evaluating claims from people whose job prospects were "not good." "They do not know which occupations have 'few or no openings'; they do not know anything systematic about levels of economic activity." 625 F.Supp. at 629. The district court went on, however, to find that the IDES decisionmakers were adequately apprised of employment conditions in claimants' occupations from information gleaned from the claimants themselves. They could detect patterns of unemployment from the claimants' occupations, and from the length of time they had been unemployed. This sort of empirical knowledge gave the reviewers the ability to make "astute inferences" about the labor market. *Id.*

### C. Federal Regulations

The DOL administers the EUC Act and the FSC Act federally. This amounts to assessing the states' compliance with the federal regulations in their programs to determine whether to reimburse the states. Pursuant to the EUC Act, Illinois enacted section 409 of the IUI Act, which reproduces the federal rules. Pursuant to the FSC Act, Illinois and the DOL in September 1982 entered into a contract under which the state promised to " 'perform all of the functions and duties ... in accordance with the [FSC] Act as interpreted by the Secretary or the Department of Labor.' " 625 F.Supp. at 630.

The district court found that although the DOL has not promulgated any regulations concerning the administration of the EUC Act or the FSC Act, it has circulated to state employment security agencies "general administration letters" (GALs) and "unemployment insurance program letters" (UIPLs). *Id.* These letters are sometimes published in the Federal Register; the district court, however, found that they were not regulations because they were not circulated for notice and comment before the DOL adopted them. *Id.* Advance copies of GALs were sometimes available to state agencies, but, according to the court, this was for the purpose of supplying extra notice, not an opportunity to comment. *Id.* The court found that "the addressees of the GALs did not have the sort of personal service that would permit the documents to be treated as regulations in the absence of published notice and opportunity for comment." *Id.* (citing 5 U.S.C. § 553(b)).

The court found that, at the time of trial, the definitive GAL was 2–83, in which the DOL stated that the requirements for seeking work under the FSC Act were the same as those under the EUC Act. *Id.* at 631; GAL 2–83, 47 Fed.Reg. 54706 (1982); *see also* UIPL 7–84, 49 Fed.Reg. 4271 (1984). The EUC Act requirements are described in GAL 21–81, an unpublished letter. *See* Appendix. The EUC Act generally requires a claimant to make a more active, "systematic and sustained," search for work than a recipient of regular benefits. He must broaden the types of work he seeks, and lower his wage expectations. If a claimant fails to accept a job offer which pays at least the minimum wage and not less than his benefit payments, he will be disqualified from receiving further EB payments. The EUC Act generally requires the state to evaluate the claimant's job search in light of the claimant's physical and mental ability, job openings, and the labor market conditions. The state classifies each EB claimant's job prospects as "good" or "not good" and monitors each claimant's eligibility by requiring "tangible evidence" of an active and suitable search for work each week. This evidence must be in line with the state's standards for a "systematic and sustained" search for work. A claimant whose job prospects are "good" has less stringent work search requirements than a claimant whose prospects are "not good."

The plaintiffs argue that by following rules that are stricter than the federal requirements IDES violated the EUC Act, the FSC Act, the DOL letters, the Social Security Act (42 U.S.C. § 503(a)), and the plaintiffs' rights to due process under the fourteenth amendment to the Constitution. Specifically, the plaintiffs alleged at trial that IDES's standards are based not on claimants' actual work search efforts but instead on answers to hypothetical questions that do not relate well to the federal requirements. The plaintiffs also argue that claimants are disqualified from receiving benefits by the state without regard to the DOL guidelines. They assert that they are subject to disqualification based on answers to the hypothetical questions without receiving adequate notice of what is expected of them. Additionally they contend that the notice claimants do receive is incomplete with regard to the work search requirements. Because of the inadequate notice, the plaintiffs assert, they are subject to disqualification at interviews and hearings without being informed about what matters are before the claims adjudicators or referees. The district court found no merit in any of these contentions, and granted defendants' motion for involuntary dismissal under Federal Rule of Civil Procedure 41(b). The plaintiffs argue that the trial judge erred in granting this dismissal. We agree and remand to the district court.

## II. STANDARDS OF REVIEW

"In ruling on a [Rule] 41(b) motion, the court must take an unbiased view of all the evidence, direct and circumstantial, and accord it such weight as the court believes it is entitled to receive." *Sanders v. General Services Administration,* 707 F.2d 969, 971 (7th Cir.1983). "The district court should make no special inferences in the plaintiff's favor ... [but] must weigh all the evidence and decide where the preponderance lies." *Furth v. Inc. Publishing Co.,* 823 F.2d 1178, 1179 (7th Cir.1987).

With respect to undisputed facts, such as the stipulated facts in this case, a reviewing court "is as capable as was the district court of determining whether [plaintiffs']

evidence, as a matter of law, was sufficient to establish a right to relief." *James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 273 (7th Cir.1976). The district court's findings of fact, however, "shall not be set aside unless clearly erroneous." Fed.R.Civ.P. 52(a). "[T]he clearly-erroneous rule ... embraces not only facts of the 'who did what to whom' variety but also legal inferences from those facts." *Wright v. United States,* 809 F.2d 425, 428 (7th Cir.1987). A reviewing court may determine a finding is clearly erroneous only when the court is left " 'with the definite and firm conviction that a mistake has been committed.' " *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)). "[T]he question [of] whether the district court's fact findings are clearly erroneous is separate from the question [of] whether, under the facts and the law, the plaintiff has shown no right to relief." *Furth,* 823 F.2d at 1180 (citing 5 J. Moore, J. Lucas, and J. Wicker, Moore's Federal Practice ¶ 41.13[1], at 41–166 to –167 (2d ed. 1986)). Based on the district court's findings of fact, this court must determine as a matter of law whether the plaintiffs proved by a preponderance of the evidence that IDES's administration of the state's unemployment insurance program violated the federal statutes or the Constitution.

## III. DISCUSSION

The plaintiffs claim that the state incorrectly distinguished between eligible and ineligible claimants based on the state's interpretation of the work search rule. They argue that IDES's use of its rules of thumb violated the DOL letters, specifically, GAL 21–81. The plaintiffs also challenge IDES's failure to use labor-market and hiring pattern information in its determinations of eligibility.

### A. Jurisdiction

Because they challenge IDES's administration of the EB and FSC programs as

violative of the Constitution and federal laws, the plaintiffs believe that their case is clearly within the language of 28 U.S.C. § 1331, which provides federal district courts with "original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States." The federal defendants assert that the district court lacked subject matter jurisdiction over the action, and moved to dismiss the case under Federal Rule of Civil Procedure 12(b)(1). The court denied the motion, setting forth its reasoning in a memorandum opinion. *Cosby v. Bernardi,* No. 83 C 3116 (N.D.Ill. Apr. 4, 1984).

The defendants raise only one of their four jurisdictional arguments on appeal. They assert that the language of the EUC Act and the FSC Act authorizes only state courts to review EB and FSC benefit determinations,[1] and that these acts supersede 28 U.S.C. § 1331. Therefore, the defendants believe, the plaintiffs should have brought their case in state court, pursuant to the Illinois Administrative Review Act, Ill.Stat.Ann. ch. 110, ¶¶ 3–101 to –112. The district court found this argument to be meritless, and we agree.

The Supreme Court considered language similar to that in the EUC and FSC Acts in a union's challenge to state agencies' administration of the Trade Act of 1974, 19 U.S.C. § 2101 et seq. *International Union, UAW v. Brock,* 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986). The UAW argued that the states were improperly determining eligibility for trade readjustment allowance (TRA) benefits. The Secretary of Labor relied on language in the Trade Act which made TRA entitlement decisions by state agencies "subject to review in the same manner and to the same extent as determinations under the applicable State law and only in that man-

ner and to that extent," 19 U.S.C. § 2311(d), to argue that no union members could challenge the DOL's policy directive that allegedly resulted in denial of TRA benefits to union members. The Court found that "[t]he Secretary's arguments simply miss the point of petitioners' claims." 106 S.Ct. at 2530. The federal courts were not becoming involved, through the UAW's suit, in individual benefits determinations, which would "remain the province of state authorities," *id.,* but were instead asked to rule on the validity of the states' administration of the entire program in terms of compliance with federal law and the Constitution. While the language in the Trade Act, which is more restrictive than that of the EUC Act or the FSC Act,

> vested state courts with exclusive jurisdiction over claims challenging a state agency's application of federal guidelines to the benefit claims of individual employees, there is no indication that Congress intended § 2311(d) to deprive federal district courts of subject-matter jurisdiction under 28 U.S.C. § 1331(a) ... to hear statutory or constitutional challenges to the federal guidelines themselves. Indeed, we have frequently upheld a contrary principle: that although review of individual eligibility determinations in certain benefit programs may be confined by state and federal law to state administrative and judicial processes, claims that a program is being operated in contravention of a federal statute or the Constitution can nonetheless be brought in federal court.

106 S.Ct. at 2530. This is just such a challenge. *See Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977); *Christian v. New York State Department of*

---

1. The EUC Act states that

   [e]xcept where inconsistent with the provisions of this title, the terms and conditions of the State law which apply to claims for regular compensation and to the payment thereof shall apply to claims for extended compensation and to the payment thereof.

   EUC Act 202(a)(2), 26 U.S.C. § 3304 note. The FSC Act states that

   the terms and conditions of the State law which apply to claims for extended compensation and to the payment thereof shall apply to claims for Federal supplemental compensation and the payment thereof; except where inconsistent with the provisions of this subtitle or with the regulations of the Secretary promulgated to carry out this subtitle.

   FSC Act § 602(d)(2), 26 U.S.C. § 3304 note.

*Labor,* 414 U.S. 614, 94 S.Ct. 747, 39 L.Ed. 2d 38 (1974).

The defendants strive to recharacterize the plaintiffs' challenges to the state's administration of the EB and FSC programs as a mere request that the district court review several individual case histories and evaluate the practices of some individual agency personnel; we find the plaintiffs' claims to be far more broad-based. The plaintiffs are not suggesting that the state erred in its computation of benefits and that a few people came up a few dollars short. Rather, they seek a declaration that IDES administered the EB and FSC programs in contravention of federal law, and an injunction ordering IDES to readjudicate their claims properly. Although "[t]he statutory challenges raised here will no doubt affect the outcome of individual entitlement determinations if [the claimants] are successful on the merits of their suit ... this action does not directly seek [EB or FSC] benefits." *International Union,* 106 S.Ct. 2530. In light of the Supreme Court's interpretation of section 2311(d), and the true nature of the plaintiffs' challenge, we believe that defendants' argument that 28 U.S.C. § 1331 is superseded by the less restrictive language in the EUC Act and the FSC Act is without merit. This is precisely the type of action for which federal review is appropriate.

*B. Preemption*

■ The state rules are not preempted by the federal statutes and regulations. "Pre-emption may be either express or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Fidelity Federal Savings & Loan Association v. De la Cuesta,* 458 U.S. 141, 152–53, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519,

525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)). Neither the EUC Act nor the FSC Act explicitly states an intention on the part of Congress to preempt the states' work search requirements.[2] Nor does the legislative history evince any such intent.

The federal requirements regarding acceptable work for unemployment claimants were adopted by Congress in 1977. Pub.L. 95–19, § 104, 91 Stat. 39, 40 (1977). Their purpose was to supplant (with respect to supplemental unemployment benefits) the existing state criteria that allowed claimants to "refuse jobs without losing their eligibility to receive unemployment benefits" and require claimants "to take any reasonable job opportunity that is available." S.Rep. No. 67, 95th Cong., 1st Sess. 8–9, *reprinted in* 1977 U.S.Code Cong. & Admin.News 79, 85–86. In order to be able to take advantage of any reasonable job opportunity, a claimant must engage in a search for such work. The legislative history of the EUC Act (the requirements of which the DOL has interpreted to be applicable under the FSC Act as well) provides that "[e]xtended benefits would be denied to any individual for so long as he or she fails to engage in a systematic and sustained effort to obtain work and fails to provide tangible evidence to the State agency that he or she has engaged in such an effort." H.R.Conf.Rep. 1479, 96th Cong., 2d Sess. 164 (1980), U.S.Code Cong. & Admin.News 1980, pp. 5526, 5952. This history does not explain or add anything to the statutory language, and fails to support plaintiffs' contention that the federal search requirements implicitly preempt the state rules and practice.

The Supreme Court has held that [w]here the pre-emptive effect of federal enactments is not explicit, "courts sustain a local regulation 'unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts dis-

---

**2.** To the contrary, both the EUC Act and the FSC Act provide that except where inconsistent, state law is to apply to claims under each Act. *See supra* note 1. Similarly, GAL 5–77 (issued Dec. 21, 1976), for example, which provides "specific direction in the areas of eligibility review and reemployment assistance," also states that state

"policies and procedures vary to such an extent that it is not readily feasible to prescribe a straight line procedure for implementing th[at] program." This language suggests that states are to retain some discretion in their implementation of the federal programs.

cern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.'"
*Metropolitan Life Insurance Co. v. Massachusetts,* 471 U.S. 724, 747–48, 105 S.Ct. 2380, 2393–94, 85 L.Ed.2d 728 (1985) (citations omitted); *see also Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 720–22, 105 S.Ct. 2371, 2378–80, 85 L.Ed.2d 714 (1985). There is no such conflict here. The state has simply decided upon some criteria to use in determining whether a claimant has engaged in a systematic and sustained search for work. Rather than conflict with the federal statutes, the state rules implement those laws.

The plaintiffs believe that the state rules are more stringent than the federal statutes and therefore conflict with the federal goal of

> protect[ing] workers still unemployed and unable to find jobs when their [regular] compensation ... is exhausted ... [by providing] additional unemployment compensation to people who are unemployed when unemployment is high and it is reasonable to expect that significant numbers of regularly employed people will be out of work for longer than normal periods.

S.Rep. No. 752, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin. News 3606, 3636. Congress also intended, however, to limit these benefits to claimants who actively seek work. By using its own criteria to evaluate claimants' work searches, the state is effectuating this intent.

Congress left administration of the unemployment statutes to a federal agency. *See Hillsborough County,* 471 U.S. at 721, 105 S.Ct. at 2379 (FDA has authority to preempt local legislation that imperils plasma supply). As the Supreme Court found in *Hillsborough County,*

> the agency can be expected to monitor, on a continuing basis, the effects on the federal program of local requirements. Thus, since the agency has not suggested that [state regulations] interfere with federal goals, we are reluctant in the

> absence of strong evidence to find a threat to the federal goal....

*Id.* The plaintiffs have not provided us with this kind of strong evidence of interference or conflict. We therefore find that the federal statutes and regulations have not preempted the state work-search rules. We discuss the DOL's efforts to monitor the states' administration of the EB and FSC programs in more detail in the next section.

■ As for the requirement that states consider labor markets and available jobs in evaluating claimants' efforts to find work, the district court found, correctly, that GAL 21–81 "does not insist that the state take account of labor markets and job openings in any particular way." 625 F.Supp. at 635. Reviewers within IDES are able to develop a perspective through which they can understand hiring patterns within specific industries, and the fact that the claimants with whom they deal have already been unemployed for at least twenty-six weeks is silent testimony about labor markets in the state. The federal defendants concede that IDES may have better implemented the federal statutes had it specifically considered relevant economic data in each individual case, and coordinated the Job Service and unemployment benefits divisions of IDES more effectively. The fact that IDES did less than the optimum, however, does not render its performance inconsistent with the federal requirements.

■ Similarly, the fact that IDES may make mistakes in applying its rules does not amount to a violation of federal law. Because IDES uses categorical rules, it encounters problems of misclassification of claimants, and because it relies on claimants' self-reporting, it sometimes finds discrepancies between what claimants say and what they actually do. The district court recognized these problems but found that "the statutes do not proscribe all potential sources of error." 625 F.Supp. at 636. Categorical rules, the court found, are a practical necessity. "There are hundreds of decisionmakers within the IDES, and unless the disposition of an application for

EB or FSC benefits is to turn on the identity of the decider, it is necessary to have some fairly simple rules." *Id.* The court compared IDES's rules to the rules the Secretary of Health and Human Services (HHS) uses in administering disability programs. The Supreme Court sustained HHS's medical-vocational guidelines in *Heckler v. Campbell,* 461 U.S. 458, 467, 103 S.Ct. 1952, 1957, 76 L.Ed.2d 66 (1983) ("even where an agency's enabling statute expressly requires it to hold a hearing, the agency may rely on its rulemaking authority to determine issues that do not require case-by-case consideration"). The IDES's rules of thumb are just such an attempt to determine issues that need not be continuously redecided. It is simply more efficient for IDES to decide only once that a claimant should be willing to accept a lower wage, to travel a certain distance, to work different hours, to contact a certain number of employers each week. It is not necessary, and, indeed, would cause unfairness through inconsistent results, for IDES to decide each of these issues individually for each claimant. The IDES must *apply* these rules individually, and the plaintiffs have not shown that it does not.

Self-reporting also is a practical necessity in order to administer programs the size of the EB and FSC programs.[3] The district court found that "[i]n 1983 there were 136,930 new claims for EB and 231,355 new claims for FSC benefits." 625 F.Supp. at 637. Although the total declined in 1984 to 110 new claims for EB and 116,263 new claims for FSC benefits, *id.,* each claim required biweekly evaluation by IDES staff members, and even as the number of new claims was declining, the continuous monitoring of existing claims was a time-consuming task. The IDES was justified, as the district court found, in accepting claimants' responses to its questions rather than attempting the arduous if not impossible task of independently investigating each claimant's efforts to obtain work. This is consistent with the federal requirements.

---

**3.** Indeed, as plaintiffs concede, the statutory requirement that a claimant provide tangible evidence of his work search implies self-reporting.

## C. The DOL Letters

The DOL does not require states to use rules of thumb in their eligibility determinations. *See* Appendix. The GAL is general in its terms, referring to "systematic and sustained" searches for work, available jobs, and economic activity in the labor market. The rules of thumb are much more specific, with objective requirements as to the number of employers a claimant must contact per week (at least five), the method of contact (personal), the wage a claimant must accept (usually minimum wage), the minimum time a claimant is willing to travel (one hour), and the shifts that a claimant is willing to work (more than just the day shift). The plaintiffs assert that the effect of the DOL letters was not an issue at trial; the district court, however, believed that it was, and found that the letters were not rules with binding legal force.

The district court characterized the plaintiffs' claim as a preemption argument: "the state uses one rule, the federal government requires another, and under the Supremacy Clause the federal rule prevails." 625 F.Supp. at 632. Because the DOL letters were not legally binding, however, according to the district court, the plaintiffs could not rely on them in challenging the state procedures. *Id.* at 633.

The plaintiffs dispute this finding, which is essentially a question of law. They argue that the DOL letters are in fact binding regulations, despite the fact that they did not comply with the notice and comment requirements of the Administrative Procedure Act (APA).

For a regulation to have the "force and effect of law," it must create "substantive" or "legislative" rules, rather than merely suggest an interpretation of a statute. Additionally, the regulation must be promulgated in conformation "with any procedural requirements imposed by Congress." *Chrysler Corp. v. Brown,* 441 U.S. 281,

302–03, 99 S.Ct. 1705, 1717–18, 60 L.Ed.2d 208 (1979).

The defendants do not dispute that the DOL letters are substantive, legislative regulations. As the plaintiffs point out, Congress has expressly authorized the Secretary of Labor to "make and publish ... rules and regulations" regarding unemployment insurance issues, and the letters in question were issued to implement the EUC Act and the FSC Act. 42 U.S.C. § 1302; *see also* 42 U.S.C. § 902. Another indication that the DOL letters are legislative is their breadth. The letters are directions to the states in their administration of the EB and FSC programs, and affect the claimants' substantive rights.

The defendants do dispute the plaintiffs' assertion that the DOL letters were issued in compliance with Congress' procedural requirements, specifically the requirement that rules be published for notice and comment under the (APA). That requirement, however, does not apply "to the extent there is involved ... a matter relating to ... public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2). Unemployment insurance benefits are clearly public benefits, and FSC is paid pursuant to a contract between IDES and the DOL. *See* FSC Act § 602(a). This contract is a "public contract" within the meaning of 5 U.S.C. § 553(a)(2). *Cf. Brown v. Housing Authority*, 471 F.2d 63, 67–68 (7th Cir. 1972). Thus Congress has not required notice and comment to give the DOL letters the force of law.

■ The DOL waived the "benefits" exception to the notice and comment provision, reimposing on itself the notice and comment rules. 29 C.F.R. § 2.7. This voluntary reimposition of the rules does not amount to a "procedural requirement imposed by Congress," *Chrysler Corp. v. Brown*, 441 U.S. at 303, 99 S.Ct. at 1718; Congress had exempted this type of program from the APA's requirements. The

DOL therefore did not have to publish its letters for notice and comment to give them the force of law. *Cubanski v. Heckler*, 781 F.2d 1421, 1428 (9th Cir.1986), *cert. granted sub nom. Bowen v. Kizer*, ⸺ U.S. ⸺, 107 S.Ct. 1282, 94 L.Ed.2d 141 (1987).

■ Federal agencies, however, are required to publish "substantive rules of general applicability" in the Federal Register, even if the rules are not first published for notice and comment. 5 U.S.C. § 552(a)(1)(D). The GAL on which the plaintiffs rely most heavily, GAL 21–81, was not published in the Federal Register. The APA provides an exception to the publication requirement if the persons subject to the rules are either "personally served or otherwise have actual notice thereof in accordance with law." 5 U.S.C. § 553(b). The district court found that the state did not receive adequate notice of the DOL letters to permit the documents to be treated as regulations. 625 F.Supp. at 630. Testimony at trial demonstrated that the DOL had begun circulating its letters in advance of their official issuance in 1982 or 1983, but that this was an unofficial practice and not uniformly followed. As the district court found, in some instances this practice was essential: One UIPL had in fact expired before its official date of issuance. The IDES employees who testified were uncertain as to when the GALs in question were received or by whom. One witness testified that the documents marked "advance copy" went to the regional offices of the DOL, but not necessarily to the state. We believe the district court was correct in finding that "the addressees of the GALs did not have the sort of personal service that would permit the documents to be treated as regulations in the absence of published notice and opportunity for comment." 625 F.Supp. at 630. Because GAL 21–81 was therefore not a binding regulation,[4] the EUC Act and the FSC

---

**4.** The APA provides that "matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Reg-

ister." 5 U.S.C. § 552(a)(1). GAL 2–83, which directs the reader to see UIPL 14–81, GAL 21–81, and GAL 21–82 regarding the work search requirements, was published at 47 Fed.Reg. 54706 (1982). Because of our doubts as to the

Act provide the only sources of authority, and unless the state's practices conflict with the statutes, they must be sustained. 625 F.Supp. at 633.

Although GAL 21–81, standing alone, is not a binding regulation on which the plaintiffs can base a challenge to the state's eligibility determinations, it is a binding construction of the EUC Act and the FSC Act between Illinois and the federal government pursuant to statute and contract. EUC Act § 201 et seq., 26 U.S.C. § 3304 note; FSC Act § 601 et seq., 26 U.S.C. § 3304 note. The plaintiffs seek to rely on the contract, but because they are not parties to it, they can use the contract only if a private right of action as third-party beneficiaries is available to them. As the district court found, "[n]o statute creates such a right of action or otherwise grants rights to the plaintiffs, so ... they may not automatically use the contract as a basis of a judicial order against the state." 625 F.Supp. at 633 (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979)).

█ In determining whether the plaintiffs may rely on a contract to which they were not parties, we look to whether the contract was made for the plaintiffs' benefit. If the contract was *intended* to benefit plaintiffs, they have enforceable rights. "If the agreement was not intended to benefit the third party, however, he is viewed as an 'incidental' beneficiary, having no legally cognizable rights under the contract." *Holbrook v. Pitt*, 643 F.2d 1261, 1270 (7th Cir.1981). "The question is not whether the contracts would benefit the [plaintiffs], but whether the parties intended to confer an actionable right on the [plaintiffs]." *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474, 1479 (7th Cir.1985). In other words, did the parties intend that the third party would have the right to sue in the event of a breach of contract? *Holbrook*, 643 F.2d at 1270 n. 17; *Price v. Pierce*, 823 F.2d 1114, 1121 (7th Cir.1987). The district court found that "[t]he plain-

tiffs may be the intended beneficiaries of the EB and FSC *programs,* but they are certainly not the intended beneficiaries of the *work search requirements."* 625 F.Supp. at 634 (emphasis in original). The EUC Act, the FSC Act, and GAL 21–81 serve the purpose of putting limits on the states' administration of the EB and FSC programs. The work search rules are intended to assist state agencies in their determinations of whom to exclude from the program; they do not create rights in claimants. The federal government, which reimburses the states for their payments under the programs, benefits from the restrictions: the less people who receive payments, the less money the federal government must spend. We agree with the district court that "[i]t is not possible to draw enforceable rights in favor of claimants from the language of GAL 21–81." *Id.*

The DOL letters may be relied on as agency interpretations of the statutes to which some deference may be accorded, however, " 'the courts have the reserve of power to substitute their own judgment on all questions of statutory interpretation.' " *Doe v. Reivitz*, 830 F.2d 1441, 1447 (7th Cir.1987) (quoting 2 K. Davis, Administrative Law Treatise § 7:11, at 55 (1979)). The EUC Act and the FSC Act call for claimants to make a "systematic and sustained" search for work. Although this is a phrase that is open to some interpretation, GAL 21–81 does not interpret it. The GAL is merely an elaboration on the statement, phrased in equally general terms. *See* Appendix. The GAL thus fails to provide us with an interpretation to which we can defer. The plaintiffs may not rely on the authority of the DOL letters in their challenge to IDES's administration of the EB and FSC programs.

### D. The Social Security Act

█ The plaintiffs argue that instead of serving to make IDES more efficient, the rules of thumb actually hindered the state's eligibility determinations, slowing

"reasonable availability" of the DOL letters, this section of the APA does not change our holding

that GAL 21–81 was not a binding regulation.

them down so much as to violate the "when due" provision of the Social Security Act. 42 U.S.C. § 503(a)(1).[5] This provision requires states to pay benefits "with the greatest promptness that is administratively feasible." 20 C.F.R. § 650.3(a); *Fusari v. Steinberg,* 419 U.S. 379, 387–88, 95 S.Ct. 533, 538–39, 42 L.Ed.2d 521 (1975); *California Department of Human Resources Development v. Java,* 402 U.S. 121, 131, 91 S.Ct. 1347, 1354, 28 L.Ed.2d 666 (1971). Claimants receive prompt initial hearings before claims adjudicators, and the plaintiffs have not shown that subsequent delays were systematic or widespread. The court was presented only with anecdotal evidence of delay in individual cases. "The plaintiffs did not introduce data on the average delay between the adjudicator's and the referee's hearings, however, and few claimants' cases reach this stage." 625 F.Supp. at 639. The court therefore concluded "that the Illinois system does not produce unacceptable delay." *Id.* The plaintiffs did not produce evidence to persuade us that this conclusion is erroneous. The plaintiffs suggest that if IDES had made sure that its Job Service personnel developed work search plans consistent with the GAL 21–81 factors and then transmitted copies of those plans from Job Service to the benefits determinations section of IDES, each claimant's work search could have been evaluated according to his plan, a result plaintiffs assert would have been more efficient. The plaintiffs do not suggest how this approach would better avoid delay, however. Examples of perhaps isolated instances of delay and suggestions for alternative methods of administration are not enough to justify injunctive relief against the state. We find that the state did not fail to pay benefits "when due."

The plaintiffs also argue that the state violated the "fair hearing" clause of the Social Security Act.[6] "Whether the statutory 'fair hearing' requirement has been met is tested by the same standards as constitutional procedural due process." *Camacho v. Bowling,* 562 F.Supp. 1012, 1020 (N.D.Ill.1983) (citing *Ross v. Horn,* 598 F.2d 1312, 1318 n. 4 (3d Cir.1979), *cert. denied,* 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980)). If the state's procedures are consistent with the Constitution, they will satisfy the requirements of the Social Security Act.

### E.  Due Process

The fourteenth amendment to the United States Constitution guarantees that no state shall "deprive any person of life, liberty, or property without due process of law." Because it is well-settled that claimants' receipt of unemployment insurance benefits is a property right, a state may not terminate these benefits without notice and an opportunity for a fair hearing. "[C]onstitutional due process requires notice that gives the [IDES's] reasons for its action in enough detail that a recipient can prepare a responsive defense." *Tripp v. Coler,* 640 F.Supp. 848, 857 (N.D.Ill.1986) (citing *Goldberg v. Kelly,* 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020–21, 25 L.Ed.2d 287 (1970); *Vargas v. Trainor,* 508 F.2d 485, 489 (7th Cir.1974), *cert. denied,* 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975)). "It is universally agreed that adequate notice lies at the heart of due process. Unless a person is adequately informed of the reasons for denial of a legal interest, a hearing serves no purpose—and resembles more a scene from Kafka than a constitutional process." *Gray Panthers v. Schweiker,* 652 F.2d 146, 168 (D.C.Cir. 1980). Parties must be notified in advance of the precise issues to be raised in the hearing. *In re Ruffalo,* 390 U.S. 544, 550–51, 88 S.Ct. 1222, 1225–26, 20 L.Ed.2d 117

---

5.  42 U.S.C. § 503(a) provides in part as follows:
    The Secretary of Labor shall make no certification for payment to any State unless he finds that the law of such State, approved by the Secretary of Labor under the Federal Unemployment Tax Act, includes provision for—
    (1) such methods of administration ... as are found by the Secretary of Labor to be reasonably calculated to insure full payment

of unemployment compensation when due. ...

6.  42 U.S.C. § 503(a)(3) requires a state to provide "[o]pportunity for a fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied."

(1968); *Navato v. Sletten*, 560 F.2d 340, 345–46 (8th Cir.1977); *Camacho v. Bowling*, 562 F.Supp. 1012, 1020–22 (N.D.Ill. 1983).

The district court found that the notices of claims adjudicator's interviews were "filled out in such a perfunctory fashion that the claimant could not know why he had been summoned." 625 F.Supp. at 625. The court, however, did not find this practice unlawful because it found that the record was insufficient to permit it "to determine in what percentage of cases the form is filled out improperly." *Id.* In order to establish the state's liability under 42 U.S.C. § 1983, the plaintiffs had to show that IDES had a "custom or usage" of sending deficient notices. *See Monell v. Department of Social Services*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978); *Wolf–Lillie v. Sonquist*, 699 F.2d 864, 870 (7th Cir.1983). "Informal actions, if they reflect a general policy, custom, or pattern of official conduct which even tacitly encourages conduct depriving citizens of their constitutionally protected rights, may well satisfy the amorphous standards of § 1983." *Id.; Webster v. City of Houston*, 689 F.2d 1220, 1226 (5th Cir.1982). It is also true, however, that

> the mere allegation of a single act of unconstitutional conduct by a municipal employee will not support the inference that such conduct was pursuant to official policies. On the other hand, where the plaintiff alleges a pattern or a series of incidents of unconstitutional conduct, then the courts have found an allegation of policy sufficient to withstand a dismissal motion.

*Powe v. City of Chicago*, 664 F.2d 639, 650 (7th Cir.1981). " 'The frequency and pattern of the practice alleged to be a custom or usage must be sufficient to give rise to a reasonable inference that the public employer and its employees are aware that public employees engage in the practice and do so with impunity.' " *Webster*, 689 F.2d at 1226 (citing Schnapper, *Civil Rights Litigation After* Monell, 79 Colum. L.Rev. 213, 229 (1979)).

The parties stipulated that the sample of claims adjudicators' files was of a sufficient size to draw ninety-five percent confident conclusions to within plus or minus three percent accuracy. Notices of claims adjudicators' interviews often were generated by computer. A list of computer-generated notices drawn from the sample claims shows that none of these notices told claimants that the issue of their interview would be whether they had impermissibly restricted their work search, and none informed claimants that they had violated a rule of thumb. Because of the parties' stipulation as to the accuracy of the conclusions drawn from the samples, it appears that none of the claimants who received computer-generated notices received adequate written notice as to the issues to be raised at the claims adjudicator's interview. The plaintiffs introduced evidence from which the district court could have found that from eighteen percent to twenty-four percent of the handwritten FSC notices were deficient, and that twenty-two percent to twenty-eight percent of the handwritten EB notices were deficient.

There is no clear consensus among the courts as to what level of frequency of the challenged conduct evidences a custom, except that it must be more than one instance. It was not necessary for the district court to determine a precise percentage of deficient notices. The plaintiffs needed only to show, by a preponderance of the evidence, that the state had a custom of sending inadequate notices. Our finding that the computer-generated notices were deficient, combined with the examples of deficient handwritten notices and the testimony of one witness that "he was instructed by his superior to omit details in order to complete more notices per day," 625 F.Supp. at 639, are sufficient to establish custom. We find that the district court's statement as to the inadequacy of the record to permit this conclusion is clearly erroneous.

The defendants assert that whatever deficiencies may have existed in the written notices were cured by appeal procedures available to claimants after they were de-

nied benefits by the claims adjudicator. The district court found that because "a claimant in Illinois gets two oral hearings, and the deficient notices affect only the first" there was no constitutional notice problem. 625 F.Supp. at 639. Aside from the fact that the plaintiffs challenged both sets of notices, this position fails to recognize that notice should be provided "at a meaningful time." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). The Supreme Court, in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), outlined three factors for courts to consider when determining the requirements of due process in various situations. These factors are

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903. The court in *Camacho v. Bowling*, 562 F.Supp. 1012 (N.D.Ill.1983), considered these three factors in the context of regular unemployment benefits. The court found, and we agree, that the significance of these benefits to claimants whose "source of steady income which supports family, health, and home has disappeared ... cannot be overstated." *Id.* at 1024. The risk of erroneous deprivation is great here because, to the extent that claimants were not apprised of the rules of thumb, it is extremely unlikely that they would be able to correctly answer the hypothetical questions on the claimant questionnaires, or to modify their work searches accordingly. The state cannot be said to have an interest in depriving unwitting claimants of benefits to which they may be entitled, and the burden of modifying its procedures to give claimants adequate notice of the rules they have violated before they come before the claims adjudicator is slight. Considering all of these factors, we believe that due process

requires the state to provide claimants with notice of exactly how their work searches have been inadequate *before* the claimants must face the claims adjudicators. As the district court observed, "[e]veryone is entitled to know what he has supposedly done wrong, for otherwise he cannot make an intelligent presentation at a hearing." 625 F.Supp. at 638.

This requirement will be of little help to plaintiffs, however, unless they are also informed of IDES's rules of thumb at the outset of their work searches. *See Carey v. Quern*, 588 F.2d 230, 232 (7th Cir.1978). Although the district court found "the rules IDES uses are not secret," 625 F.Supp. at 638, this finding was based on the fact that the Board of Review's decisions, presumably applying the rules, are available to the public in a digest maintained by IDES. *Id.* at 626. The district court also found that IDES had a manual of benefits decisions containing "important decisions of the Board." *Id.* The digest did not exist during the operation of the EB and FSC programs. It was not published until September, 1985, pursuant to the consent decree in *Welch v. Bowling*, 79 L. 16004 (Circuit Court of Cook County, May 14, 1984, *amended* May 30, 1985, *amended* Feb. 19, 1986). The basis of the complaint in *Welch* was that the digest's precursor, the manual of benefits decisions, had not been available to the public. *Id. Welch* settled before that issue could be resolved. The district court did not specifically find that the manual was available to the public, only that it existed. If the district court's finding that the IDES's rules are not secret is based on the belief that the digest was available during the times in question, the finding is clearly erroneous. And if it is based on the belief that claimants had access to the manual, then the finding has no support in the record. If the manual is indeed available to the public, the defendants should be able to demonstrate its availability on remand.

The district court also found that IDES furnished claimants with "written notices of the general requirements of the program and supplie[d] oral explanations of

the notices." 625 F.Supp. at 638. The written notices tell claimants to expand their work searches and accept any work paying more than minimum wage that is within their physical and mental abilities. The FSC notice tells claimants about the five-contacts-per-week rule. The EB notice does not. The court found that the notices told claimants what they needed to know "without a level of detail that might have made the forms even more difficult to comprehend than they are." *Id.* at 639. To the contrary, the notices only hinted at the requirements imposed by the five rules of thumb. It would have been no more difficult for IDES to set out a checklist of the rules of thumb than it was for the state merely to allude to the requirements and trust the claimants to infer from the notices' general language five specific rules.

Although the EB and FSC notices advised claimants to relax their wage demands, shift preference, travel time and other job search restrictions, and to seek any work within their capabilities, the claimants were not told that they could be denied benefits if, for instance, they said they were willing to travel forty-five minutes instead of one hour.

The defendants argue that the programs' eligibility requirements were restated orally to claimants by IDES technicians, who were also willing to answer whatever questions claimants had. This argument is not supported by the record, however. One technician testified that he explained to claimants about travel time and shift requirements, but another testified that she offered no information beyond that in the printed notice. A third technician initially testified that she gave claimants additional information, but she was impeached on cross-examination by her earlier deposition testimony.[7]

The district court's finding that some technicians "volunteered information beyond that on the notices," 625 F.Supp. at 639, was not clearly erroneous. The defendants, however, are misguided in their reliance on this finding to support their argument that IDES personnel cured whatever defects existed in the written notices as to claimants' responsibilities for their work searches. The defendants may be able to establish that claimants were adequately informed of the EB and FSC work search requirements; they will have the opportunity to do so on remand.

Because the plaintiffs argue that claimants received inadequate written and oral notice of their work search responsibilities, their position is that claimants have no knowledge of the requirements until they meet with a claims adjudicator, after they have completed two weeks of searching for work and submitted their questionnaires. The questionnaires referred to claimants' efforts in the preceding two weeks, and claimants could not change answers after they were submitted. Therefore, if a claimant's answers were "wrong," he lost benefits for those two weeks and became ineligible for future benefits.

The defendants argue that the EB and FSC programs were like regular benefits in that claimants would file an initial claim during the first two weeks of eligibility and have a benefit rights interview at that time. The defendants ask us to take judicial notice of an Illinois Department of Labor office bulletin stating that claims adjudicators may not date a claim earlier than the first day of the week the claimant reports to file a claim. This bulletin, defendants assert, renders impossible the situation in which claimants learn of the rules when it is too late to do anything more to comply with them. We note in passing that this argument assumes that technicians at the benefit rights interviews inform claimants of the rules, which the defendants have not yet demonstrated. Although we decline to take judicial notice of this bulletin at this juncture, defendants will have an opportunity to argue this point on remand.

## IV. CONCLUSION

We find that plaintiffs at this stage of the trial have shown by a preponderance of the evidence that IDES violated their due

---

7. This technician repeated her direct testimony on cross-examination.

process rights by failing to provide them with adequate notice of the work search rules of thumb and the precise issues to be determined by the adjudicators. As we noted earlier, this failure to meet constitutional standards of due process also violates the "fair hearing" clause of the Social Security Act, 42 U.S.C. § 503(a)(3). Because the district court terminated the trial after the plaintiffs presented their case, we remand to give the defendants an opportunity to rebut the plaintiffs' evidence and for such other purposes as may be appropriate. The district court's rulings on the statutory issues (with the exception of those under the "fair hearing" clause of the Social Security Act) are affirmed. Circuit Rule 36 may not apply on remand but shall be at the option of the judge who presided at the trial. We also leave to the original trial judge's discretion, should he preside on remand, whether to resume the trial from the point at which it was ended, or rehear the plaintiffs' evidence on the constitutional issues. In so holding we do not intend to convey any view as to the appropriate final outcome of this case after the trial is concluded.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR ADDITIONAL PROCEEDINGS IN ACCORDANCE WITH THIS OPINION.

APPENDIX

GAL 21–81, section III (issued May 12, 1981).

III. *EB Eligibility Requirements*

Under P.L. 96–499 claimants must meet the following requirements:

A. *Active Search for Work.* An EB claimant is expected to make a more diligent and active search for work than would normally be required of an individual receiving regular benefits. To meet EB eligibility requirements the claimant's search for work must be "systematic and sustained." A "sustained" effort to obtain work is a continual effort maintained at length throughout each week. Under the requirement to actively seek work, passive availability for work is not sufficient. A "systematic" effort to obtain work is a work search conducted with thoroughness

and with a plan or methods to produce results. Registration with a referral union will be considered as partially meeting the active search for work requirements, but individual work search efforts will be required in every case to demonstrate an active search for work.

SESAs shall advise all EB claimants of the work search requirements they must meet each week to demonstrate an active search for work.

If there are no or few openings in an individual's customary occupation, he/she must broaden the types of work sought to meet the "active" search for work requirement even if the claimant's job prospects are classified as "good." The broadening of types of work sought to include work other than the claimant's highest skill or customary work must be accompanied by a willingness by the claimant to lower his/her wage expectations. Claimants who restrict their job search to their customary occupation as a mere preference, not based upon physical or mental capability or conditions of the labor market, and by this limitation fail to maintain an active search for work will be ineligible for extended benefits for failing to actively seek work. In determining whether the individual has met the active search for work requirements, where the openings in an individual's customary occupation are few or nonexistent, the SESA shall consider:

   a.  Available Jobs—hiring patterns

   b.  Economic Activity—labor market

   c.  Claimant's Physical and Mental Ability

SESAs must monitor each EB claimant's continuing eligibility in light of the special active search for work requirements. This monitoring can be done effectively through:

   —Eligibility Review Interviews

   —Development of work search plans specifying actions to be taken by claimants

   —Comparison of reported work search contacts with actions specified in work search plan

—Evaluation of adequacy and appropriateness of work search contacts

—Verification of work search contacts

States which either do not now require tangible evidence of an active search for work for each week claimed or which require only employer name, address and results, should modify procedures to ensure that "tangible evidence" of a "systematic and sustained" work search is provided by the claimant. A record of the following information is both helpful to those searching for work and necessary to claims staff who must determine that the claimant's search for work is "systematic" and "sustained."

1. Employer name and address

2. Method of contact (unions, ES referral, phone, in person, specify other)

3. Name of person contacted

4. Date of contact

5. Type of work sought

6. Result of contact

7. Was an application taken?

. . . .

In determining the adequacy of work search information required of EB claimants, the adequacy of currently required information should be evaluated against the information specified above. As a minimum, it is recommended that the "tangible evidence" required to determine if a claimant's efforts are "systematic and sustained" include items 1 through 7.

*Exception:* An EB claimant who is in a State-approved training program during any week for which EB is claimed will be exempt from the work search requirements. This exception for such claimants accords with the requirements in Section 3304(a)(8), FUTA, which prohibits denial of benefits by reason of an active search for work requirement when the individual is in such a training program.

Claimants must provide "tangible evidence" of a "systematic and sustained" search for work during each week claimed. SESAs must establish standards based upon their knowledge of the labor market of what constitutes a "systematic and sus-

tained" search for work for the various labor market areas within the State. The EB claimant's "tangible evidence," report of work search activities must be reviewed and screened for each week claimed in accordance with the established standards.

When the review and screening of an EB claimant's work search indicates possible ineligibility because of a failure to actively seek work, the claimant's eligibility must be determined under the EB actively seeking work provisions.

The amount of effort expended and the number of employer contacts required during a week to demonstrate a "systematic and sustained" effort to obtain work will vary by labor market areas within a State. The number of employers a claimant is expected to contact to show he/she is actively seeking work depends on many factors, such as the number of employers and employment opportunities in a local area, the geographical size of the local labor market and the availability of transportation.

Therefore, the forms and methods employed by States to obtain "tangible evidence" of a "systematic and sustained" search for work must be designed with space for a sufficient number of entries of work search contacts to accommodate the variations in employment opportunities and size of the various local labor market within a State. States should design their report of work seeking activities form with space for the entry of the maximum number employer contacts required to demonstrate a "systematic and sustained" search for work in the largest labor market area in the State.

B. *Job Prospects Classification.* It is intended that EB claimants be considered differently than claimants of regular benefits because of the duration of their unemployment.

When claimants file an initial claim for EB their prospects for obtaining work in their customary occupation shall be considered not good, unless they can furnish evidence satisfactory to the SESA that their pros-

pects for obtaining work within a reasonably short period (4 weeks) are good.

The SESA should advise each EB claimant whose prospects for reemployment are not good that he/she will be subject to EB suitable work provisions. Under the EB provisions any work which is within the individual's capabilities is considered suitable work.

C. *Referral for Job Placement.* All EB claimants whose job prospects have been determined to be "not good" must be referred immediately for registration and referral to any suitable jobs fitting the EB suitable work definition. EB claimants previously registered with the Job Service whose prospects are "not good" must have their registrations updated to reflect EB status since EB suitable work provisions are applicable. SESAs must establish procedures for forwarding and exchanging information for the adjudication of EB claims issues regarding:

1. Refusal of job offers;

2. Refusal of referrals;

3. Able and Available issues;

4. Results of referrals to suitable work;

5. Failure to report and other issues;

Such information must be documented and where appropriate accompanied with supportive evidence to assist the adjudication process.

D. *Failure to Apply for or Accept Suitable Work.* If a claimant determined to have good prospects of obtaining work in his/her customary occupation within a reasonably short period fails to apply for or accept suitable work, the claimant's eligibility to receive benefits would be determined according to the standards and criteria applied under the State law to determine eligibility for regular benefits.

When an individual's prospects of obtaining work in his/her customary occupation are classified not good and the individual has refused to apply for or accept work which he/she is capable of performing, the suitability of the work will be determined according to the standards and criteria applicable to extended benefits.

If the individual's job prospects have been found to be *not good* and the individual has refused to accept or apply for work suitable under the EB provisions, the EB disqualification would be imposed. Such a disqualification would be subject to the following restrictions:

1. The gross average weekly pay for the offered work must exceed the individual's weekly benefit amount, plus any supplemental unemployment benefits (SUB) payable.

2. The job must have been offered to the individual in writing or listed with the SESA.

3. The pay must equal or exceed the higher of the minimum wage under section 6(a)(1), the Fair Labor Standards Act of 1938, or any applicable State or local minimum wage.

4. The work must have been suitable under all suitable work provisions for regular benefits which do not conflict with the special EB provisions. Under this provision for example, the offered work must meet the labor standards requirements of the State law.

If an individual fails to apply for or accept suitable work, he/she shall be ineligible to receive EB for the week in which such failure occurred and continuing for the duration of his/her unemployment until such time as the individual has worked in employment during at least 4 weeks and has earned not less than 4 times his/her weekly benefit amount and is determined to be otherwise eligible.

The question of whether an issue exists and whether determinations would be in order when claimants do not file claims for weeks during which they failed to apply for or accept an offer of suitable work would be governed by applicable State law.

The following examples should provide guidance in resolving EB work refusal issues when the claimant's job prospects are "not good" and the regular benefit disqualification would not apply:

1. An individual will be disqualified from receiving EB if he/she refuses suit-

able work which was offered in writing or listed with the SESA.

2. An individual will be disqualified if he/she refuses a referral to a job by the SESA (listed) but not offered in writing by an employer provided the offer of a referral meets other conditions for imposing a disqualification.

3. An individual will be disqualified from receiving EB for refusing to accept a job offered in writing by an employer but which is not listed with the SESA.

4. An individual will not be disqualified from receiving EB for refusing a job which is neither offered in writing nor listed with the SESA.

E. *Eligibility Review Program (ER).* It is expected that individuals who are in EB have been through eligibility review and will continue to receive intensified services in this program.

F. *Active Search for Work.* To be eligible for EB, claimants are required to actively seek work. When it is determined that an individual has not been actively seeking work during a week, the SESA shall issue a determination holding the individual ineligible to receive EB for such week and until the individual has had employment during at least 4 weeks and has received remuneration for such employment not less than 4 times the individual's weekly benefit amount.

A determination would not be required if the claimant does not file a claim for the week(s) during which he/she did not make an active search for work. However, the individual's eligibility should be carefully considered if the claim is reopened and the claimant files for subsequent weeks of unemployment.

The requirement that individuals "actively engage in seeking work" is applicable to all claimants with respect to each week of unemployment for which extended benefits are claimed after March 31, 1981. An individual who does not seek work during a week because he/she was unable to work or unavailable for work for some compelling or uncontrollable reason not related to active search, is subject to the requirement to "actively" seek work to the same extent as all other EB claimants. If the individual does not meet this requirement, the disqualification for failing to actively engage in seeking work must be imposed.

The laws of some States provide that a claimant continues to be eligible if he is unavailable because of illness or disability occurring after filing a claim and registering for work if no offer of work that would have been suitable at the time of registration is refused after the beginning of such disability. Under such circumstances an individual in EB status must still make an active search for work and will be subject to a disqualification as specified above for failing to actively seek work.

G. *Requalification Following Disqualification.* An individual subject to a disqualification in connection with the benefit year of the parent claim or during a period of EB eligibility as the result of voluntarily leaving employment, discharge for misconduct or the refusal of suitable work will be eligible for EB only if the disqualification is lifted under State law provisions which require employment subsequent to the date of the disqualification.