Geraldine DOSTON, et al., Plaintiffs,

v.

Edward T. DUFFY, et al., Defendants.

No. 85C2356.

United States District Court,
N.D. Illinois, E.D.

Nov. 23, 1988.

Heidi Noun, Diane Redleaf, Sherry Faulkner, William Janulis, John M. Bouman, Steven F. Fabry, Steven Coursey, Legal Assistance Foundation, Chicago, Ill., for plaintiffs.

James C. O'Connell, Steven Hogroian, Randall J. Gudmundson, Barbara L. Yong, and Katherine M. Marshall, Chicago, Ill., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

HART, District Judge.

### I. NATURE OF CASE

The four original plaintiffs filed a complaint against the Director of the Illinois Department of Public Aid ("IDPA") and the Chief of the Bureau of Child Support Enforcement ("BCSE") of the Illinois Department of Public Aid, on behalf of a class, seeking declaratory and injunctive relief. The complaint, brought under 42 U.S.C. § 1983, asserting jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), alleges that the policies and practices of IDPA for terminating Aid to Families with Dependent Children ("AFDC") benefits of recipients who fail to cooperate with BCSE in establishing paternity and obtaining child support violate federal law and the Fourteenth Amendment of the United States Constitution.

The named plaintiffs are AFDC recipients who were terminated from the AFDC program because of noncooperation. Their benefits were restored pursuant to a temporary restraining order entered on April 9, 1985.

Plaintiffs joined three additional named plaintiffs and moved for an extension of the temporary restraining order which was granted on April 19, 1985.

Plaintiffs' motion for a preliminary injunction was referred to a magistrate for hearing and a report. On June 27, 1985, the magistrate filed a comprehensive report and recommendation which is incorporated herein by reference. The magistrate recommended that the court grant a preliminary injunction. On August 1, 1985, the court adopted the recommendations and issued a preliminary injunction in favor of plaintiffs.

Thereafter, five additional named plaintiffs were joined. Defendants agreed to restore AFDC benefits to these additional plaintiffs as well as to other putative class members identified pending resolution of the case. This agreement has been extended since the granting of plaintiffs' motion for a preliminary injunction.

Plaintiffs moved for class certification. The magistrate recommended that a class be certified. Defendants did not object to the magistrate's recommendation. This motion was granted on June 2, 1986. The plaintiff class is defined as:

> All applicants for and recipients of Aid to Families with Dependent Children ("AFDC") benefits from the Illinois Department of Public Aid whose benefits, on or after March 22, 1980, have been, are being, or will be denied or terminated by IDPA on the ground that they allegedly failed to cooperate with Illinois in establishing paternity or obtaining child support under the State's child support enforcement program. 42 U.S.C. § 651 *et seq.*

A trial was held focusing on the issues of defendants' policies regarding noncooperation determinations and the sufficiency and adequacy of defendants' notices to plaintiffs regarding the noncooperation determinations and terminations of plaintiffs' AFDC benefits. The specific policies challenged were defendants' policies regarding: (1) determining whether or not a client provided all the information known or reasonably obtainable about the absent parent; (2) accepting as sufficient for cooperation client's attestation as to the completeness and accuracy of the information provided concerning the absent parent; and (3) de-

termining whether or not a client had a valid reason for failing to attend an appointment at which a client was to provide information about the absent parent. Plaintiffs also challenge the sufficiency and adequacy of the notice defendants currently send regarding noncooperation determinations, Form DPA 157NC.

The evidence demonstrated that defendants' policies regarding sufficiency of notice, accepting attestations, and making determinations as to whether or not the client provided all the information known or reasonably obtainable about the absent parent violate both federal regulations and the due process clause. Defendants current valid reason (for failing to appear) policy violates neither federal regulations nor the due process clause. The evidence demonstrated that defendants DPA 157NC notices do not meet the due process standard and must be changed to provide clients with comprehensible explanations of: (1) the reason benefits are being terminated and (2) appeal rights and procedures.

The AFDC program is a federal-state cooperative effort administered by the state under Title IV–A of the Social Security Act (the "Act"). 42 U.S.C. § 601 *et seq.* The Act requires states participating in the program to comply with the provisions promulgated thereunder. 42 U.S.C. § 602(a)(27). The overall purpose of the AFDC program is to "encourag[e] the care of dependent children in their own homes or in the homes of relatives." 42 U.S.C. § 601. Each participating state must maintain a child support enforcement program which complies with Part D of Title IV of the Act. The purposes of Part D of Title IV include "enforcing the support obligations owed by absent parents to their children and the spouse (or former spouse) with whom such children are living, locating absent parents, establishing paternity [and] obtaining child and spousal support." 42 U.S.C. § 651. Caretaker relatives are required to assign their rights to child support and to cooperate in establishing the paternity of the child. 42 U.S.C. § 602(a)(26).

Federal administrative regulations have been enacted that require a caretaker relative to perform acts of cooperation. Cooperation is defined in federal regulations as including the following acts when applicable:

(1) Appearing at an office of the State or local agency or the child support agency as necessary to provide verbal or written information, or documentary evidence, known to, possessed by, or reasonably obtainable by the applicant or recipient;

(2) Appearing as a witness at judicial or other hearings or proceedings;

(3) Providing information, or attesting to the lack of information, under penalty of perjury; and

(4) Paying to the child support agency any child support payments received from the absent parent after an assignment under § 232.11 has been made.

45 C.F.R. § 232.12(b)(1–4).

Refusal to cooperate on the part of an individual caretaker can result in AFDC ineligibility. 42 U.S.C. § 602(a)(26)(B). Federal regulations allow the state to:

Impose conditions upon applicants for and recipients of public assistance which, if not satisfied, result in the denial or termination of public assistance, if such conditions assist the State in the efficient administration of its public assistance programs, or further any independent State welfare policy, and are not inconsistent with the provisions and purposes of the Social Security Act.

45 C.F.R. § 233.10(a)(1)(ii)(B).

The legislative history of the IV–D Program shows that Congress chose to condition AFDC benefits on cooperation in paternity and child enforcement proceedings as implementation of its determination that "a mechanism should be provided to ascertain the child's paternity whenever it seems that this would both be possible and in the child's best interest." S.Rep. No. 1356, 93d Cong., 2d Sess. 39916, *reprinted in* 1974 U.S.Code Cong. & Admin.News 8133, 8155. *See* 43 Fed.Reg. 45742 (1978). Included among the potential benefits a child may derive from having paternity established

are the right to inheritance, the possibility of social security, veterans or other government benefits, and the possibility of child support payments if collected.

The Department of Health, Education and Welfare has interpreted the legislative history of a good cause exception to the cooperation requirement (45 C.F.R. §§ 232.-40 through 232.49) as showing that Congress intended that the support enforcement process not cause harm to the same children it was attempting to help through establishing paternity and securing support. 43 Fed.Reg. 45747 (1978).

Congress enacted the child support provisions of Title IV–A and Title IV–D in large part to assist AFDC clients in becoming self-sufficient. *See* S.Rep. No. 1356, 93d Cong., 2d Sess. 39916, *reprinted in* 1974 U.S.Code Cong. & Admin.News 8133, 8146. Congress viewed the child's welfare as the primary concern in child support enforcement. *Id.* at 8155. At the same time, Congress recognized that AFDC clients often lack information and resources on their own to locate absent parents and enforce child support orders. *Id.* at 8146–47. Therefore, while Congress expected AFDC clients to take the first step of identifying the absent parent for the state agency, it expected states then to locate absent parents and seek paternity and child support orders. To assist states in fulfilling these duties, Congress enacted a host of tools in Title IV–D to aid states in child support collection, including, *inter alia,* funding for creation of a parent locator service. *Id.* at 8134, 8149–58; 42 U.S.C. §§ 653, 659.

Title IV–D of the Social Security Act requires that each participating state maintain a single and separate organizational unit to administer the child support program. 42 U.S.C. § 654(3). Such a unit is commonly called a IV–D unit. BCSE is the IV–D unit in Illinois. The IV–D unit is required to remain separate from the IV–A unit, which unit administers the AFDC program.

On July 11, 1986, IDPA published a Proposed Rule in accordance with the Administrative Procedure Act, Ill.Rev.Stat. ch. 127, ¶ 1005 *et seq.* (1985), with respect to the "cooperation policy" under the child support enforcement program. The Rule was amended and adopted effective November 14, 1986. 89 Ill.Admin.Code § 160.30. See Appendix A. 10 Ill.Reg. 19996.

In addition, IDPA issued a policy memorandum dated August 1, 1986 effective August 14, 1986 amending its written policies and procedures consistent with the Amended Rule. See Appendix B.

Defendants contend that based upon the changes adopted by the amended rule and policy memorandum, plaintiffs' claims are moot and any injunctive, declaratory, and ancillary notice claims are moot. Plaintiffs deny that the changes either facially or. as implemented cure the matters concerning which complaint is made.

Specifically, plaintiffs contend that defendants' cooperation rules and policies are unlawful for the following reasons:

(1) In making cooperation determinations, IDPA relies on caseworkers' assumptions of what clients' knowledge about absent parents should be rather than on clients' attestations under penalty of perjury.

(2) Indefinite delay in reinstating AFDC clients' benefits violates the Social Security Act and the Due Process Clause.

(3) Defendants' "No Valid Reason" for failure to attend an appointment or hearing policy violates the Social Security Act, Federal Regulations and the Due Process Clause.

(4) IDPA's form of Notice of Termination and appeal process in noncooperation cases violates the Due Process Clause and Federal Regulations.

The parties have agreed to the entry of a consent order regarding the issue of the length of the sanction imposed upon clients for noncooperation with child support enforcement efforts in the court process. The order was presented at the beginning of the trial without any admission by either party as to any issue of fact or law not resolved and solely for the purpose of settling that issue. The court will enter the agreed upon relief as part of the final judgment order and decree.

## II. FINDINGS OF FACT

### A. Stipulated Facts *

### B. Facts Established at the Hearing

Based on the testimony and exhibits presented at trial, the court further finds as follows:

196. Dr. Donna G. Franklin was called as an expert witness on behalf of the plaintiffs. Her testimony concerned (a) the difficulty of poor black persons to provide the location of absent parents and (b) the dangers of subconscious bias in subjective decisionmaking by middle class caseworkers. Dr. Franklin is an associate professor at the University of Chicago School of Social Service. Dr. Franklin's field of research is the clinical level of social work (rather than at the theoretical or policy level). Her published works include the study of social worker practitioner variables associated with differential clinical judgments of black and poor clients. Her publications include "Differential Clinical Assessments: The Influence of Class and Race," *Social Service Review*, 59(1) (1985), and "Does Client Social Class Affect Clinical Judgments?" *Social Casework*, 67(9) (1986). Dr. Franklin is a co-investigator for the University of Chicago study, "Poverty and Family Structure in the Inner City," funded by the Ford Foundation, the Wood Charitable Foundation, the Department of Health and Human Services, and the Rockefeller Foundation.

197. Based on the testimony of Dr. Franklin it appears that much social science research has been focused on the demographics of the poor black community. Using census tracts, efforts have been made to locate and study the residential practices of poor black males. It has been determined that there is a high level of transciency in poor communities. Ethnographers have investigated the causes of transiency and have found it to be related to an unemployment rate of 37%, to criminal activity, and to alcohol and drug abuse. Ethnographers have also found it difficult to trace and locate the poor black male

population. In one instance 10 males were found living in a car wash.

198. In a survey of poor black women in the 18–44 age group, 69.7% indicated that they were parents. In the same age group, only 39.2% of the males responded that they were parents. While there is never a parity in such responses, the differential for other socio-economic groups is in the range of five to seven percent. Ethnographers attribute some of the disparity to transiency among the population. Other explanations are that there appear to be 74 males for every 100 females in the community and that many males do not reveal and sometimes conceal where they reside. This data tends to support statements of AFDC clients as to lack of knowledge of absent parents' whereabouts.

199. Data obtained from the Violence Branch of the Cook County Circuit Court has been studied. This court was established to hear complaints of domestic violence against women and children among others. The greatest group of complainants come from poor areas. The data shows that approximately 50% of the defendants against whom complaints are made cannot be located either because the defendant's address is not known or is, as provided, erroneous. This evidence also tends to show that the poor will have more difficulty in tracing absent parents.

200. Poor educational achievement, lack of employable skills, inability to compete economically or politically, unemployment, and reliance on public welfare, are some of the features of the poorer class which are more or less absent from the middle class.

201. Studies have been conducted of the clinical judgments of social workers and health care workers who deal with the poor. The data indicates that there is a statistical basis to conclude that a subconscious bias exists based on differences in social and economic classes of the caseworkers and the clients. This bias is not based upon race. Researchers hypothesize that sharp normative and value differences

---

* Editors note: The stipulated findings of fact are omitted from published version, but are available on WESTLAW.

between middle class social workers and poor clients contribute to this bias. Many middle class norms of conduct carry an economic cost beyond the reach of the poor. Also, values and aspirations of the poor are affected by poverty.

202. Differences in social classes can be difficult to recognize and respect. Every social class tends to develop a way of life of its own that can be called culture—patterns of behavior that are taken for granted, that provide a sense of identity, psychological satisfaction, and a sense of community. Class differences can give rise to irritating clashes and conflicts.

203. Although the existence of a possible subconscious class bias is known to graduate level and trained social workers, research evidence tends to show the dangers of subjective decisionmaking and the need for objective guidelines and objective decisionmaking.

204. In the *opinion* of Dr. Franklin, the August 14, 1986 policy memorandum ("August 14 Memo") (JX 14) permits FSSs to apply their personal assumptions concerning the adequacy of the amount of information clients know, possess, or can obtain about absent parents. The use of the word "reasonable" implies a subjective judgment. The policy memorandum contains the question: "Has the client provided information *expected to be known* based on the nature of the relationship (i.e. parties were married, living together or dating, length of the relationship, financial aspects of relationship and how recent was the relationship?)" Judgment by the worker must be made based on what the worker "expects" the client to know, based on the worker's norms and values.

205. The reasons and findings of Dr. Franklin with respect to subjective decisionmaking are not necessary to a decision in this case.

206. Dr. Judith N. Levi was called as an expert witness on behalf of the plaintiffs. Dr. Levi is a professor and chairman of the Department of Linguistics at Northwestern University. Her field of study and research is theoretical linguistics—including syntax, semantics, and word formation—

and applied linguistics—including language, law, and composition. Dr. Levi has published articles and conducted research relating to language of the law and the judicial process and has appeared as an expert witness with respect to documents of notice used in the welfare system.

207. Approximately 75% of the United States' poverty population have reading skills no higher than the eighth grade literacy skill level. The documents of welfare agencies often require substantially higher reading levels than possessed by welfare clients. In a 1977 sample of 81 documents of six agencies, only 11% were judged accessible to those with eighth grade skills (DX 163).

208. Dr. Levi analyzed the obstacles to comprehension of the forms used in 1984 (JX1) and 1988 (JX55) to notify AFDC caretaker parents of a reduction in the amount of a grant due to determinations of noncooperation and of rights of appeal connected with that notice. The analysis was based on consideration of vocabulary choice, syntax, semantics inferencing, discourse organization, document design, and missing information. Thirty-nine specific items were the subject of comment (PX 191, 192).

209. The 1988 form uses bureaucratic jargon (e.g. "care assistance unit") and long and syntaxically complex sentences. Serious semantic or word meaning problems exist. A key sentence states "Beginning _____ your benefits will be: Reduced because your needs are being removed from your public aid case." It is not, however, the recipient's needs that are being removed. It is rather that funds to provide for those needs are being eliminated from the aid payment to the recipient. The notice combines information about why the action is being taken with various proceedings, including appeal rights, a scheduled appointment for interview, and the right to request informal action. The notice also includes information about how to stay the reduction pending a possible appeal. The contents of the notice is in English and Spanish. English and Spanish

statements are stated in alternate paragraphs.

210. Only 60% to 65% of the clients who received a DPA 157NC in January 1988 through May 1988 contacted IDPA. The confusing language of the DPA 157NC notice contributed significantly to the fact that 35% to 40% of the clients, whose AFDC benefits are terminated when they are deemed noncooperative by IDPA, do not respond to the notice.

211. Because of the wording of DPA 157NC, clients are not adequately informed about the action to be taken by IDPA, the reasons for the action to be taken, their hearing rights, and the circumstances under which AFDC benefits will be paid pending a hearing decision.

212. The DPA 157NC appears in two versions: DPA 157NC–AC, and DPA 157NC–C. The DPA 157NC–AC is sent to clients residing in Cook County and contains these two additional sentences: "For your convenience, an appointment has been scheduled to discuss how you can demonstrate cooperation with the Child Support Enforcement Program on this matter on _____ in Room 800, 32 West Randolph Street, Chicago, Illinois at ____. Whether or not you attend this appointment, you still have the right to appeal this action." In place of these two sentences, the downstate version contains this sentence: "If you wish to demonstrate cooperation, call the telephone number at the top of this notice." Except for these sentences, the two versions of DPA 157NC are identical.

213. Since September 24, 1987, the 157NC notice contains one of the four following reasons for the reduction in benefits (the reasons are given only in English on the 157NC): (1) "You failed to cooperate with the Child Support Enforcement Program by failing to appear in court on _____. This court proceeding involved the obtaining of child support from the absent parent(s) of the child(ren) for whom you receive assistance." (2) "You failed to cooperate in testifying in court on _____. This court proceeding involved the obtaining of child support from the absent parent(s) of the child(ren) for whom you receive assistance." (3) "You failed to cooperate with the Child Support Enforcement Program by failing to appear for an appointment on _____. This appointment involved the obtaining of child support from the absent parent(s) of the child(ren) for whom you receive assistance." (4) "You failed to cooperate during an interview with the Child Support Enforcement Program on _____ by failing to provide all the information which you knew or could reasonably obtain about the absent parent(s) of the child(ren) for whom you receive assistance." The fourth "reason" does not state exactly what information the client knew or could reasonably obtain but failed to provide.

*Practices Concerning the Amount of Information AFDC Clients "Should" Provide to BCSE*

214. Prior to August 14, 1986, IDPA permitted the FSS to apply personal views as to what information the client should know about the absent parent and the FSS made cooperation determinations based upon their personal views. Pursuant to IDPA's August 14 Memo, the FSS is told to consider marital status, length and nature of relationship, and "financial aspects" of the relationship between a client and an absent parent in determining what information a client is expected to know about an absent parent. Except when the client is married to the absent parent, the FSS is given no written guidelines by IDPA as to how to evaluate the factors identified in the August 14 Memo. IDPA policy does not require the FSS to determine whether a client has provided all information about the absent parent which she knows, possesses, and can obtain before making a determination as to whether the client has cooperated with the child support enforcement program.

215. Under current IDPA policy, after the client has attested to the completeness and accuracy of the information provided, the FSS makes a determination as to "whether or not the client provided all the information known or reasonably obtainable" about the absent parent. The FSS

makes this determination based on the following "objective" criteria: (1) Has the client provided consistent information or has inconsistent information been supplied for which there is no reasonable explanation? (2) Has the client provided information expected to be known, based on the nature of the relationship? Were the parties married, living together, or just dating? What was the length of the relationship? What were the financial factors of the relationship (joint bank accounts, tax returns, contributions from other parent, etc.)? How recent was the relationship? Does a member of that absent parent's family live in the area and to what extent can/will he/she provide information? (3) Has the client provided incorrect or misleading information? (JX 38) (IDPA/BCSE Child Support Enforcement Manual §§ 205.2(a)–.2(b)).

216. There are no written guidelines or standards to inform the FSS how to apply the above criteria. The objective criteria applied by the FSS in determining "whether or not a client has provided all the information known or reasonably obtainable" permits a subjective decision.

217. Although a client has attested under penalty of perjury that she has provided all information requested and that the information provided is true, and in the absence of any independent evidence that the client withheld information or knowingly gave a false answer, the FSS may, nevertheless, determine that the client has not provided all the information known or reasonably obtainable. In such a case, the client is deemed noncooperative and therefore ineligible for AFDC benefits without any investigation for possible perjury or fraud.

218. The FSS may insist that the client state who the absent parent is in situations where the client is unsure of the absent parent's identity. A client who does not provide information which the FSS assumes she should know or possess is considered noncooperative. The FSS is not required to have any credible independent evidence that an AFDC client possesses information she has not provided before

finding her noncooperative. IDPA policy permits the FSS to find an AFDC client noncooperative regardless of the relevance of the omitted information to locating an absent parent, establishing paternity, or obtaining child support. Clients may be held noncooperative based on the view that the client has not provided enough information to locate the absent parent.

219. Information for which clients have been found noncooperative both prior to and since August 14, 1986, includes an imprecise address, other approximate information, not knowing the age of the absent parent, or not remembering certain information about the absent parent.

220. BCSE has no guidelines as to what constitutes a reasonable attempt to obtain information. In cases in which the FSS gives a client the opportunity to obtain more information, the FSS may or may not tell the client what specific information she needs to obtain or how to obtain it. The FSS may sanction clients who report they could not obtain additional information about the absent parent.

221. When a client has been sanctioned for not providing sufficient information about the absent parent, the only way she can be found cooperative is to furnish information which she may be unable to provide.

222. Defendants concede there are problems with the decisionmaking process, but assert that the opportunity for an administrative hearing following the FSS determination provides an adequate remedy. However, the hearing process does not remedy the arbitrary nature of the decisionmaking process because the hearing officers also apply IDPA's standardless policy of requiring that a client provide all information which IDPA employees believe should be known.

223. There are no guidelines concerning when and how to complete Form DPA 1611 or 1611A, "Notice Concerning Cooperation in the Court Process." A client who testifies in court in a manner different than expected may be found noncooperative by IDPA without further inquiry into the circumstances surrounding the testimony.

224. Until December 28, 1987, if a blood test excluded as a parent the person named by a client to be the absent parent, the client was considered to be noncooperative by IDPA, even if the client claimed the test results were mistaken. Although IDPA has since changed its policy of automatically finding the client noncooperative if the blood test excludes a named absent parent, it has not notified sanctioned clients of the policy change.

225. Prior to November 1, 1984, IDPA excused a client from keeping a particular child support office appointment or a court date when circumstances beyond the client's control, such as illness or inclement weather, prohibited her from attending. IDPA's policies allowed a client to present a "valid reason" for a missed appointment and thereby avoid the termination sanction. Beginning November 1, 1984, IDPA deemed clients noncooperative when they missed two child support appointments or court dates, even if the client had a valid reason for missing one or both appointments (e.g., illness, including hospitalization of the client or her child, death in the family, transportation breakdown, etc.). Effective August 14, 1986, clients could claim some valid reasons for failing to keep an appointment or otherwise cooperate in the child support enforcement process. Under the August 14 Memo, clients are considered noncooperative if they miss one appointment or court date and are found not to have a valid excuse. If a client misses a child support interview or court date, IDPA sends the client a DPA 157 or 157NC deleting the client from the AFDC grant without first determining if the client had a valid reason for missing the appointment. The only verification an AFDC client needs to support a claim for a valid reason for missing a child support appointment or court date is a client's own statement except in two situations: (1) the client has failed to cooperate with BCSE requirements on at least one other occasion within a 30–day period, or (2) evidence independent of the client's explanation of valid reason casts doubt on the client's claim (e.g., repeated claims of illness, lack of child care, etc.).

226. IDPA does not consider nonreceipt of an appointment notice or notice of a court date a valid reason for missing the appointment or court date unless IDPA has evidence that the notice was mailed to the wrong address or it was returned to IDPA.

227. When application is made for AFDC benefits, IDPA provides a pamphlet entitled, "Child Support Enforcement Program," DPA 1759, which, instead of informing the client of IDPA's "valid reason" policy and explaining how and when to claim a valid reason, states only that if a client for a good reason cannot keep her appointment with BCSE she must call her FSS before her appointment so other arrangements can be made. Clients never receive any documents from BCSE which explain IDPA's "valid reason" policy and inform the client how and when she can claim a valid reason. IDPA has never informed AFDC clients in writing of the valid reason policy or the procedure to claim a valid reason set forth in the August 14 Memo.

### The Valid Reason Policy in the Court Process

228. In Cook County, under the August 14 Memo, when a client misses a court date the state's attorney does not determine whether the client had a "valid reason" for missing the court date before completing a DPA 1611A form and sending it to the CGRT ("Central Grant Reduction Team"). When the CGRT receives a DPA 1611A from the state's attorney, it does not determine if the client had a "valid reason" for missing the court date before completing a DPA 157NC and sending it to the client.

229. Clients who have been sanctioned by IDPA for non-cooperation are never informed in writing how they can be found cooperative and be reinstated to their AFDC grant.

### Reinstatement Following Termination for Noncooperation in the Interview Process

230. IDPA does not advise sanctioned clients in writing either of their right to

request a new interview or how to obtain a new interview in order to attempt to be found cooperative. When a client has been sanctioned for not providing sufficient information about the absent parent, the only way she can be found cooperative is to furnish the information she lacks. Once sanctioned for lack of sufficient information, clients may remain sanctioned indefinitely.

### Notice of Termination

231. In Cook County, CGRT issues a DPA 157NC (Notice of Change Based on Non-cooperation) when it receives a DPA 1611A from the State's Attorney's Office or a DPA 1611B from an FSS. Until September 24, 1987, CGRT was to attach a DPA 1611A (for cases of alleged noncooperation in the court process) or DPA 1611B (for cases of alleged noncooperation in the interview process) to the DPA 157NC. These forms were the client's only notice of IDPA's reason for terminating her AFDC and medical benefits. Since September 24, 1987, the DPA 157NC has been the client's only notice of IDPA's reason for termination.

232. Until September 24, 1987, the front side of the DPA 157NC set a "scheduled hearing date" at CGRT even though the client had not yet appealed the cancellation of her AFDC benefits. The front side of DPA 157NC did not inform the client of another, different appeal process available to her if she filed a notice of appeal with IDPA. After September 24, 1987, the front side of the DPA 157NC does not set a specified hearing date at CGRT. Instead, either the DPA 157NC or a separate notice enclosed with the DPA 157NC schedules an appointment for the client at CGRT to discuss means of demonstrating cooperation with BCSE. The front side of the DPA 157NC does not advise a client of her rights at a hearing, including her rights to continued benefits if she files an appeal request within ten days, to present witnesses, to examine her case file, to cross-examine IDPA's witnesses, and to be represented by counsel.

233. Until September 24, 1987, clients who did not appear for the hearing date specified on the front of the DPA 157NC had their AFDC grants reduced, unless they had obtained in advance the consent of a CGRT staff member to reschedule the hearing date specified on the front of the DPA 157NC or they had filed a separate appeal within ten days from the date of the DPA 157NC. After September 24, 1987, all clients who are sent a DPA 157NC have their AFDC grant reduced and medical eligibility card stopped, regardless of whether they attend the separately scheduled appointment at CGRT. However, if a client files an appeal within sixty days of the date on the DPA 157NC, she will be restored to the grant pending the decision on her appeal, although the restoration may take three weeks or more. During this period, clients may also obtain emergency medical eligibility cards one week at a time.

234. After September 24, 1987, when CGRT or the local downstate office is notified of a client's failure to cooperate, immediate action is taken to delete the noncooperative client from her grant, including her medical assistance. Employees at CGRT or the local downstate offices complete Forms DPA 552 and DPA 2943 and enter the data into the statewide computer system which then terminates the benefits and generates the DPA 157NC notice to be sent to the client. For clients living in Illinois counties other than Cook County, the DPA 157NC notice does not set an appointment for the client. Instead, the notice simply states "Your need will be restored to your Public Aid case beginning the date you demonstrate cooperation with the Child Support Enforcement Program. If you wish to demonstrate cooperation, call the telephone number at the top of this notice."

235. For Cook County, there is an automatic appointment date at CGRT for the client to discuss how she can demonstrate cooperation. The appointment is usually scheduled approximately ten days after the date of the notice. However, according to Diane Pellegrini, Assistant Bureau Chief for Policy and Procedure at IDPA, there is no written policy requiring the appointment to be set within ten days of the notice. As

shown by the evidence, appointments are sometimes scheduled more than ten days after the date of notice. Since it takes IDPA approximately two weeks to reinstate a client to her benefits and because of factors such as when the client's fiscal month falls, IDPA may not be able to reinstate a client to her full benefits without a delay or a break in her benefits even if the client appears at her scheduled appointment and is found cooperative. The DPA 157NC notice does not inform clients that, in order for them to avoid delay or a break in their benefits, they must immediately request an appeal in writing.

236. An example of the delay or break in benefits that can result from IDPA's policy of terminating benefits at the same time it generates a notice to the client informing them of the "intended" action is the case of Dorothea McNeal. (JX 55; DX 165; DX 166). Dorothea McNeal missed a child support enforcement appointment March 1, 1988. Her AFDC benefits were terminated and a DPA 157NC notice dated April 29, 1988 was sent. The notice set her appointment with CGRT for May 11, 1988. McNeal appeared at the scheduled appointment. The FSS at CGRT determined that she had a valid reason for missing her March 1, 1988 appointment and that she was cooperative with IDPA. The FSS also completed a Form 552 to reinstate McNeal to her AFDC benefits. The May 11, 1988 date, however, was too late to prevent a break in benefits. McNeal's regular June 1988 benefit check represented benefits only for her children. Several days later, IDPA sent McNeal a supplemental voucher representing her benefits for the month.

237. Until September 24, 1987, the "scheduled hearing date" at CGRT could have been more than ten days after the date of notice on the DPA 157NC. After September 24, 1987, the "scheduled appointment" at CGRT still can be set more than ten days after the date of notice of the DPA 157NC.

238. Until September 24, 1987, AFDC clients who missed their CGRT "scheduled hearing date" received no letter informing them of their right to reschedule their hearing. After September 24, 1987, AFDC clients who missed their CGRT "scheduled appointment" receive no letter informing them of their right to reschedule their appointment.

239. Until September 24, 1987, the CGRT considered these interviews to be "pre-appeal conferences." The CGRT FSS had no authority to rescind the sanction action and find the client cooperative except when they found a valid reason. After September 24, 1987, the CGRT no longer calls these separately scheduled appointments "pre-appeal conferences." However, according to the policy memorandum that introduced these changes, "[t]he procedure for taking action on the case has not changed."

240. Until September 24, 1987, the DPA 157NC did not explain to the AFDC client that she would have a "pre-appeal conference" with a CGRT staff member rather than a "hearing" on the date and time specified on the form. When IDPA claims the client failed to appear in court, and the client appears at the hearing date specified on the DPA 157NC (or, after September 24, 1987, at the separately scheduled appointment), the CGRT FSS interviews the client to find out why she missed the court date. If the interviewer determines the client has a valid reason for missing the court date, the interviewer can rescind the proposed sanction.

241. When IDPA claims the client failed to appear at a local office interview and the client appears at the hearing date specified on the DPA 157NC (or, after September 24, 1987, at her separately scheduled appointment), she automatically is given a new interview in the intake unit even if she has no valid reason for missing the prior interview.

242. When IDPA claims the client failed to cooperate during the local office interview or in the court process, and the client appears at the hearing date specified on the DPA 157NC (or, after September 24, 1987, at the separately scheduled appointment), the CGRT interviewer determines whether to refer the client for an interview with the intake unit. Such referral is made

only if the CGRT interviewer determines that a FSS from the intake unit may find the client cooperative.

243. Upon referral by the CGRT interviewer to the Intake Unit, the client is to be interviewed by a FSS. If the FSS in the intake unit then finds the client noncooperative, the client is referred back to the CGRT interviewers. If CGRT finds the client noncooperative, the client is sanctioned.

244. Clients do not receive a pre-appeal conference letter at any time during the appeal process. After concluding the interview(s), the CGRT FSS may or may not ask the client whether she wants to appeal.

245. Until September 24, 1987, the client who wanted to appeal normally had her appeal hearing that day. She was given no statement of fact other than DPA 157NC, DPA 1611A, or DPA 1611B if attached, no time to secure counsel, and no opportunity to review her file. After September 24, 1987, a client is given no statement of facts other than DPA 157NC and no opportunity to review her file.

246. Clients are not adequately informed about the action to be taken by IDPA; about the reasons for the action to be taken; about their hearing rights; and about the circumstances under which AFDC benefits will be paid pending a hearing decision. Unlike other IDPA pre-appeal conferences, in these conferences, the CGRT FSS have no authority to rescind the sanction and find the client cooperative except when they find the client had a valid reason for missing an interview or court appointment. Form DPA 157NC does not explain to the AFDC client that she will have a "pre-appeal conference" with a CGRT staff member rather than a "hearing" on the date and time specified in DPA 157NC. If the CGRT FSS believes the client is providing sufficient information she will be sent to one or more additional interviews with an FSS who may or may not find her cooperative. If she is not found cooperative, she is sent back to CGRT. Clients do not receive a pre-appeal conference letter prior to the "scheduled hearing date" or at any other time. The client who wants to appeal normally has her appeal hearing that day. She is given no statement of facts other than DPA 157NC, DPA 1611A, or DPA 1611B if attached, no time to secure counsel, and no opportunity to review her file.

247. A client's AFDC file is not at CGRT, either prior to or at the appeal hearing. Documents, including FSS notes, completed questionnaires, and prior appointment or cancellation notices are not maintained in a client's child support file with CGRT. Consequently, a client who comes to CGRT for her "scheduled hearing date" cannot review all the documents pertaining to her child support cooperation appeal.

## III. CONCLUSIONS OF LAW

Based on the foregoing findings of fact, the court concludes as follows:

1. This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

2. Plaintiffs have proven both individually and as class representatives that defendants, acting pursuant to state policies, have violated the Social Security Act, implementing regulations, and the due process clause of the Fourteenth Amendment to the Constitution.

3. IDPA has an obligation under the Supremacy Clause of the Constitution to grant AFDC benefits to persons made eligible under the Social Security Act. *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *Townsend v. Swank*, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); *Carleson v. Remillard*, 406 U.S. 598, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972).

■ 4. IDPA may not legally impose more restrictive eligibility requirements for receiving AFDC than those set out in the Act and implementing regulations. *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *Townsend v. Swank*, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); *Carleson v. Remillard*, 406 U.S. 598, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972), *Simpson v. Miller*, 535 F.Supp. 1041 (N.D. Ill.1982).

■ 5. The Department of Health and Human Services' interpretation of the Social Security Act is entitled to substantial deference. *Youakim v. Miller,* 425 U.S. 231, 96 S.Ct. 1399, 47 L.Ed.2d 701 (1976) (per curiam); *New York State Dept. of Social Services v. Dublino,* 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

■ 6. Cooperation with IDPA in establishing paternity and obtaining child support is a condition of eligibility for AFDC benefits under the Social Security Act unless good cause for refusing to do so is determined to exist. 42 U.S.C. § 602(a)(26); 45 C.F.R. § 232.12(a).

### Assumption of Knowledge and Attestation Policies

7. Under 45 C.F.R. § 232.12(b), clients are cooperative in establishing paternity and obtaining child support if they provide information about the absent parent "known to, possessed by, or reasonably obtainable by them or if they attest under penalty of perjury to their lack of information about the absent parent."

■ 8. IDPA violates 45 C.F.R. § 232.12(b) by maintaining a policy of finding clients noncooperative who have attested under penalty of perjury to their lack of information, or would attest if given the opportunity, without having credible independent evidence that the clients have withheld information or knowingly given a false attestation. *Buckner v. Maher,* 424 F.Supp. 366, 374 (D.Conn.1976), *aff'd,* 434 U.S. 898, 98 S.Ct. 290, 54 L.Ed.2d 184 (1977).

■ 9. IDPA violates 45 C.F.R. §§ 232.12(b), 233.10(a)(iv), and the due process clause by maintaining a policy of allowing IDPA caseworkers to assume clients know or should know more information than they provided, and, until December 28, 1987, IDPA violated 45 C.F.R. §§ 232.12(b), 233.10(a)(1)(iv), and the due process clause by maintaining a policy of presuming clients, who named a father excluded by blood tests, are noncooperative

on the basis of the blood test alone. *Amos v. Dept. of Health & Rehabilitative Services,* 444 So.2d 43 (Fla.Dist.Ct.App.1983); *Williams v. Dept. of Health & Rehabilitative Services,* 461 So.2d 1004 (Fla.Dist.Ct. App.1984); *R.K. v. Dept. of Human Services,* 215 N.J.Super. 342, 521 A.2d 1319 (1987); *Atkinson v. Ledbetter,* 183 Ga.App. 739, 360 S.E.2d 66 (1987).

■ 10. IDPA violates 45 C.F.R. §§ 232.12(b) and 233.10(a)(1)(iv) by maintaining a policy allowing IDPA caseworkers, without standards and independent evidence, to assume clients can secure additional information; allowing caseworkers to require that clients secure additional information not reasonably available to them; and failing to determine if clients made a reasonable effort to secure additional information.

■ 11. 45 C.F.R. § 233.10(a)(1) precludes IDPA from excluding individuals or groups from AFDC eligibility on an arbitrary, unreasonable, or inequitable basis. 45 C.F.R. § 206.10(a)(10) requires states to determine eligibility in a manner consistent with the objectives of the AFDC program. IDPA violates the due process clause by allowing caseworkers to make inconsistent, arbitrary determinations of cooperation based on factors which IDPA does not define. *White v. Roughton,* 530 F.2d 750 (7th Cir.1976) (per curiam); *Carey v. Quern,* 588 F.2d 230 (7th Cir.1978); *Perez v. Chang,* 438 F.Supp. 238 (D.Ha.1977); *Baker–Chaput v. Cammett,* 406 F.Supp. 1134 (D.N.H.1976).

### Valid Reason For Failure To Appear Policy

■ 12. IDPA's failure to publish advance notice to clients of its August 14, 1986 reimplementation of policy requiring a valid reason for failure to appear did not violate either 45 C.F.R. § 233.10(a)(1) or the due process clause. *Gardebring v. Jenkins,* 485 U.S. 415, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988).

■ 13. Plaintiffs' claim that IDPA has a "no valid reason" policy which violates their procedural rights to notice of

changes under the due process clause of the Constitution and federal law is moot based on IDPA's reimplementation of a valid reason policy pursuant to the promulgation of 89 Ill.Admin.Code § 160.30, effective November 14, 1986.

14. IDPA's valid reason policy does not violate notice requirements of the due process clause of the Constitution or 45 C.F.R. §§ 206.10(a)(10) and 233.10(a)(1).

*Timely Notice*

15. 45 C.F.R. § 205.10(a)(4)(i) requires that IDPA notify clients of intended actions to discontinue, terminate, suspend, or reduce assistance in a timely and adequate manner. 45 C.F.R. § 205.10(a)(4)(i)(A) specifies that, to be timely, a notice must be mailed at least ten days before the action to discontinue, terminate, suspend, or reduce assistance would become effective. IDPA's action to "delete" noncooperative caretaker relatives "from their grants" is an action to discontinue, terminate, suspend, or reduce assistance, which does not fall under any of the exceptions to the timely notice requirement. *See* 45 C.F.R. §§ 205.10(a)(4)(ii), 205.10(a)(4)(iii).

16. IDPA's policy of deleting noncooperative caretaker relatives from grants at the time it generates the DPA 157NC notice to the affected clients violates the timely notice requirement of 45 C.F.R. § 205.10(a)(4)(i) and also violates the due process clause of the Fourteenth Amendment because it deprives clients of an opportunity for a pre-termination hearing. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Vargas v. Trainor*, 508 F.2d 485 (7th Cir.1974), *cert. denied*, 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975).

17. 45 C.F.R. § 205.10(a)(4)(i)(B) specifies that, to be adequate, a notice must include a statement of what action the agency intends to take, the reasons for the intended action, the specific regulations supporting such action, explanation of the individual's right to request an evidentiary hearing, the circumstances under which assistance is continued if a hearing is re-

quested, and, if the agency action is upheld, that such assistance must be repaid. *Cosby v. Ward*, 843 F.2d 967 (7th Cir.1988) (Illinois violated unemployment insurance claimant's due process rights by failing to provide adequate notice of substantive rules and issues to be determined); *Tripp v. Coler*, 640 F.Supp. 848 (N.D.Ill.1986) (IDPA failed to notify adequately medical recipients of intended restrictions on use of medical eligibility cards and of steps to be taken to avoid restrictions).

18. 45 C.F.R. § 205.10(a)(13) provides that a client or her legal representative shall have the right to examine her case file and all documents and records to be used by the agency at a reasonable time before the date of her hearing, to bring witnesses, and to be represented by counsel. IDPA's hearing process, as described on the front of DPA 157NC, violates 45 C.F.R. § 205.10(a)(13) by failing to provide for the opportunity to examine case files in advance of the hearing. *Areizaga v. Quern*, 442 F.Supp. 168, 172–73 (N.D.Ill. 1977), *aff'd*, 590 F.2d 226 (7th Cir.1978) (per curiam).

19. The due process clause requires that a state agency explain, in terms comprehensible to the client, exactly what the agency proposes to do and explain the agency's reasons for its action in enough detail that the client can assess the correctness of the agency's decision, make an informed decision as to whether to appeal, and be prepared for the issues to be addressed at the hearing. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Vargas v. Trainor*, 508 F.2d 485 (7th Cir.1974), *cert. denied*, 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975); *Banks v. Trainor*, 525 F.2d 837 (7th Cir. 1975), *cert. denied*, 424 U.S. 978, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); *Dilda v. Quern*, 612 F.2d 1055 (7th Cir.) (per curiam), *cert. denied*, 447 U.S. 935, 100 S.Ct. 3039, 65 L.Ed.2d 1130 (1980); *Ortiz v. Eichler*, 794 F.2d 889 (3rd Cir.1986). The due process clause prohibits unintelligible, confusing, or misleading notices, or any notices which do not meaningfully inform

clients of their hearing rights. *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Memphis Light Gas & Water Division v. Craft,* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); *Mayhew v. Cohen,* 604 F.Supp. 850 (E.D.Pa.1984); *David v. Heckler,* 591 F.Supp. 1033 (E.D.N. Y.1984); *Dealy v. Heckler,* 616 F.Supp. 880 (W.D.Mo.1984); *Camacho v. Bowling,* 562 F.Supp. 1012 (N.D.Ill.1983).

20. DPA 157NC must be modified to meet the standards of due process.

### *Delay*

■ 21. The Social Security Act at 42 U.S.C. § 602(a)(10) and the federal regulations at 45 C.F.R. §§ 206.10(a)(3), 206.10(a)(10), 233.10(a)(1)(vi), and 233.10(a)(1)(vii) require IDPA to determine clients' AFDC eligibility promptly and furnish aid promptly to eligible persons. IDPA's policy of delaying clients' reinstatement to the AFDC grant until the client attends her next court date, which results in delays of many months, without affording clients an interim opportunity to cooperate, violates the aforesaid statute and regulations.

■ 22. In depriving plaintiffs of their rights under the Social Security Act, implementing regulations, and due process clause, IDPA has been acting pursuant to state policies, in violation of 42 U.S.C. § 1983. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Cosby v. Ward,* 843 F.2d 967 (7th Cir.1988); *Wolf–Lillie v. Sonquist,* 699 F.2d 864 (7th Cir.1983). Their claims are not moot by virtue of amended rules issued during this proceeding.

■ 23. Plaintiffs' request for injunctive and declaratory relief against IDPA policies is not barred by the Eleventh Amendment. *Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). Plaintiffs are entitled to injunctive and declaratory relief. Plaintiffs have no adequate remedy at law since the Eleventh Amendment bars an award of damages by the court. *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

■ 24. Plaintiffs are entitled to notice relief ancillary to the injunctive and declaratory relief. The Eleventh Amendment does not bar such ancillary relief. *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

■ 25. Plaintiffs are entitled under 42 U.S. § 1988, 28 U.S.C. § 2412, and Fed. R.Civ.P. 54(d) to present their request for attorneys' fees and costs.

### APPENDIX A

Section 160.30 Cooperation With Support Enforcement Program

a) As a condition of individual eligibility for AFDC, a caretaker relative must cooperate with the Department in identifying/locating the responsible relative and in obtaining support from the responsible relative and enforcing support obligations, unless the Department determines there is good cause for refusing (see 89 Ill.Adm.Code 101.20 for definition of "caretaker relative").

b) If the caretaker relative and his/her spouse are in the home and are included in the assistance grant, both must comply with the cooperation requirements. A caretaker relative who fails/refuses, without good cause (see Section 160.35 thru 160.45), to cooperate in the enforcement of support obligations shall be excluded from the assistance grant.

c) "Cooperating with the Department in identifying/locating the responsible relative and in obtaining and enforcing support obligations" means:

1) appearing at such places as the Department, the Department's legal representative's office (such as the Attorney General or his designee), as necessary, and providing verbal or written information, or documentary evidence, known to, possessed by, or reasonably obtainable by the applicant or recipient;

2) appearing and testifying as a witness at judicial proceedings;

3) paying to the Department any child support payments received from the responsible relative; and

4) providing information, or attesting to the lack of information (i.e., all information or documentary evidence, known to, possessed by, or reasonably obtainable by the caretaker relative about the responsible relative), under penalty of perjury (for the penalty for perjury, see Section 32–2 of the Criminal Code [Ill. Rev.Stat.1985, ch. 38, par. 32–2]). All caretaker relatives must sign a statement attesting that:

A) he/she has to the best of his ability, provided all information requested of him/her, and

B) all information which he/she has provided is true and correct to the best of his/her knowledge.

d) Evidence of a caretaker relative's failure/refusal to cooperate in identifying/locating the responsible relative and/or in obtaining and enforcing support obligations includes but is not limited to;

1) A) failure/refusal, without a valid reason, to appear for an appointment, interview at such places as the Department or the Department's legal representative's office or failure/refusal to appear and/or testify as a witness at a judicial proceeding (the appointment/interview/judicial proceeding are only those referred to in Section 160.30(c)(1) thru (c)(4) *. A caretaker relative's failure/refusal to appear for an appointment/interview or to appear and/or testify at a judicial proceeding, without a valid reason, will result in sanction by the discontinuance of financial and medical assistance for that caretaker relative. A caretaker relative may claim valid reasons for failure/refusal to appear for an appointment/interview at such places as the Department or the Department's legal representative's office or for failure/refusal to appear and/or testify at a judicial proceeding. Examples of valid

reason for failure/refusal to cooperate include, but are not limited to:

i) illness,

ii) incapacity (e.g., a broken leg, information of a scheduled surgery or recuperation from surgery),

iii) death in the family,

iv) non-Child Support Enforcement Court required appearance,

v) temporary incarceration,

vi) family crisis,

vii) breakdown in child care arrangements,

viii) sudden or unexpected emergency,

ix) unavailability of otherwise suitable child care, or

x) breakdown in transportation arrangements or lack of reasonably available transportation.

B) The Department will not require a caretaker relative to document valid reason(s) for failure/refusal to cooperate unless:

i) the caretaker relative has failed/refused to appear for an appointment/interview/court proceeding on at least one other occasion within a thirty (30) day period from the first failure to appear, or

ii) evidence independent of the explanation of valid reason contradicts the caretaker relative's explanation. (The caretaker relative must provide such documentation [e.g., physician statement, dated pharmacy statement, hospital admission statement] within ten (10) days from the day the valid reason claim was made. If such documentation is not provided, AFDC benefits to the caretaker relative will be discontinued.)

C) The sanction for failure/refusal to appear for an appointment/interview/court proceeding shall be rescinded at any level of the sanction process up through and until the final agency decision, and any lost benefits will be restored, if the caretaker relative established a valid reason for his/her failure/refusal to keep his/her sched-

---

* Agency Note: The caretaker relative is sent a written notice advising of the scheduled appointment/interview/court proceeding at least ten (10) days prior to such a meeting.

uled appointment/interview or to appear and/or testify at a judicial proceeding.**

2) failure/refusal to provide all information which is available to him/her about the identity and/or location of the responsible relative, as determined by the following objective criteria:

A) inconsistent statements of information relevant to identifying/locating the responsible relative and/or obtaining and enforcing the support obligation, which the caretaker relative cannot reconcile;

B) failure/refusal to provide information which it is reasonable to know or be able to obtain. The amount of information which a caretaker relative is expected to provide is based on:

i) the length of the relationship with the responsible relative,

ii) the type of relationship (i.e., marriage, co-habitation, dating),

iii) the recency of the relationship, and

iv) the financial aspects of the relationship; or

C) has knowingly provided incorrect or misleading information.

e) Evidence of a caretaker relative's failure/refusal to cooperate in identifying/locating the responsible relative and/or in obtaining and enforcing support obligations, does not include:

1) mere suspicions on the part of the interviewer (e.g., the Family Support Specialist, the State's Attorney);

2) interviewer's conjectures based solely on the caretaker relative's attitude or demeanor; or

3) the caretaker relative's inability to provide enough information for the Par-

ent Locator Service to locate the responsible relative.

f) The Department will advise those caretaker relatives whom it believes are failing/refusing to cooperate with Child Support Enforcement Program requirements that appropriate sanction will be taken (i.e., the caretaker relative will be excluded from the assistance grant).

g) If the caretaker relative fails/refuses to comply with the requirements listed in subsection (c) above, he/she is ineligible for financial and medical assistance for as long as he/she continues to fail/refuse to cooperate. If the caretaker relative later indicates that he/she is willing to cooperate, he/she will be given the opportunity to cooperate.*** The caretaker relative will be determined to have cooperated if he/she complies with the requirements (see subsection (c) above) that he/she previously failed/refused to meet.

h) A caretaker relative can appeal the Department's determination that she/she failed/refused to comply with the requirements of subsection (c) above. Such appeal shall be in accordance with 89 Ill.Adm.Code 102.70 thru 102.82 and 104: Subpart A.

i) The sanction for failure/refusal to cooperate with Child Support Enforcement Program requirements listed in subsections (c)(1) thru (c)(4) shall be rescinded at any level of the sanction process up through and including the final agency decision, and any lost benefits will be restored, if the caretaker relative establishes good cause for failure/refusal to cooperate with the Child Support Enforcement Program.

---

** Agency Note: The term "sanctions" or "sanctioning process" refers to the discontinuance of financial and medical assistance to the caretaker relative for as long as he/she fails/refuses to cooperate with the Child Support Enforcement requirements listed in Section 160.30(c)(2) thru (c)(4).

*** Agency Note: In the case of a caretaker relative who was sanctioned for missing an interview/appointment (without a valid reason), if the caretaker relative indicates that he/she is now willing to cooperate, a new appointment/interview will be scheduled as soon as

possible, but no later than three (3) weeks from the date the Bureau of Child Support Enforcement is notified that the caretaker relative wishes to cooperate. In the case of a caretaker relative who was sanctioned for not appearing at a court proceeding (without a valid reason), if the caretaker relative indicates that he/she is now willing to cooperate, the Department's legal representative will obtain a new court date. The Department's legal representative will attempt to have the matter set for the earliest available court date.

## APPENDIX B

## POLICY MEMORANDUM *

Effective Date 8/14/86

Amends Policy Memorandum

Dated 10–26–84

Re: Attestation by IV–D Client
Valid Reason for Non–Cooperation
Standards For Determining Coopera-
tion

This memorandum provides new policy and procedures requiring every client interviewed by the Bureau of Child Support Enforcement (BSCE) to attest that he/she has provided all information known about the responsible relative, and the information provided is true and correct to the best of the client's knowledge. It also revises policy and procedures allowing a client to claim a valid reason for failing to cooperate in the support enforcement process. It provides standards for determining acceptable evidence of a client's failure/refusal to cooperate with IV–D. These changes are being made to provide standards for staff to use when applying the Department's AFDC IV–D related or Child Support Enforcement Policy and Procedures, and to allow clients an opportunity to attest to a lack of information or claim a valid reason for failing to cooperate in support enforcement.

*Attestation*

1. Upon completion of the IV–D interview, the Family Support Specialist completes Form DPA 1067, Responsible Relative Master Record, requests the client to review the information entered on the form and sign the form. The specialist stamps the following statement in either English or Spanish, according to the client's language preference, in the remarks section on Form DPA 1067:

   "I attest under penalty of perjury, that to the best of my ability, I have provided all information requested, and that this information is true and correct to the best of my knowledge." Signature_____.

* Also distributed to holders of CSE Manuals

—When the client signs the form attesting to the completeness and accuracy of the information, the specialist makes a determination of whether the client has cooperated and provided all known or reasonably obtainable information about the relative (see 2 below). The specialist enters in the 200 BYTP Field of Form DPA 1067: ATTEST SGND (mo-dy-yr).

—If the client refuses to sign the attestation, enter "Refused to Sign" on the signature line, and enter Code 40INT in Item 100 on Form DPA 1067. The case is referred to the Central Grant Reduction Team (CGRT) for Cook County or the local office for Downstate Counties to delete the non-cooperative client from the assistance unit. The CGRT attaches a copy of Form DPA 1611A, Notice of Failure to Cooperate, or Form DPA 1611B, Notice Regarding Client Cooperation, to Form DPA 157NC, Notice of Change, to advise the client of the intended deletion action. Downstate caseworkers are to attach a copy of Form DPA 1611, Notice of Failure to Cooperate, to Form DPA 157, Notice of Change, to advise the client of the intended deletion action.

Give the client a copy of Form DPA 1067.

2. The specialist makes a determination as to whether or not the client has provided all information which is known or reasonably obtainable about the relative. The determination is made using the following objective criteria:

—Has the client provided consistent information or has inconsistent information been supplied for which there is no reasonable explanation?

—Has the client provided information expected to be known based on the nature of the relationship, (i.e., parties were married, living together or dating, length of relationship, financial aspects of relationship and how recent was the relationship)?

—Has the client provided incorrect or misleading information?

THE DETERMINATION IS NOT TO BE MADE BASED ON THE SUSPICION THAT THE CLIENT HAS MORE INFORMATION, THE ATTITUDE OF THE CLIENT, OR THE CLIENT'S INABILITY TO PROVIDE ENOUGH INFORMATION TO REFER THE CASE TO THE PUBLIC AID LOCATOR SERVICE.

When the specialist determines the client has provided all information known or reasonably obtainable about the relative, the appropriate action/disposition is entered in Item 100, on Form DPA 1067, and the case is referred to the appropriate party.

If the specialist determines the client failed to provide all information known about the responsible relative or information the client could obtain, enter Code 40INT in Item 100, on Form DPA 1067. The case is referred to the CGRT (Cook) or local office (Downstate). The client is deleted for non-cooperation until he/she demonstrates cooperation (See AFDC PO/PR–550.3 and the 10–26–84 Policy Memorandum). The CGRT attaches a copy of Form DPA 1611A or Form DPA 1611B to the Form DPA 157NC, when advising the client of the intended deletion action. Downstate caseworkers are to attach a copy of Form DPA 1611 to the Form DPA 157 sent to the client.

*Valid Reason*

Clients who are not exempt from cooperation for good cause may claim a valid reason for failing to keep an appointment, or otherwise cooperate in the support enforcement process. DO NOT USE THE VALID REASONS OR PROCEDURES IN AFDC PR–550.3c. DISREGARD THAT PORTION OF THE 10–26–84 POLICY MEMORANDUM ELIMINATING THE VALID REASON CRITERIA. A client's opportunity to claim a valid reason for failing to cooperate in the support enforcement process is in addition to the client's claim to be exempt from support enforcement for *good cause*, as explained in AFDC PO/PR–550–3b.

Clients are now given one opportunity to attend a *SCHEDULED APPOINTMENT* with a Family Support Specialist, or otherwise cooperate in the support enforcement process as explained in AFDC PO–550.3a, unless the client has a valid reason for the non-cooperation. Valid reasons include but are not limited to:

—illness or incapacity,

—death in the family,

—non-IV-D court appearance or temporary incarceration,

—family crisis,

—breakdown in child care arrangements,

—sudden or unexpected emergency,

—unavailability of suitable child care, or

—breakdown in transportation arrangements or lack of reasonably available transportation.

A client may claim a valid reason for not being able to keep a IV–D appointment:

—upon receipt of an appointment notice by calling BCSE before the scheduled appointment, explaining the valid reason and requesting a new appointment, or

—upon receipt of Forms DPA 157NC (Cook) or DPA 157 (Downstate), Notice of Change, advising the client of the Department's intention to delete him/her for non-cooperation.

Accept the client's statement for having a valid reason for not cooperating without requiring any additional verification unless:

—the client has failed to cooperate with IV–D requirements on at least one other occasion within a thirty (30) day period, or

—evidence independent of the client's explanation of valid reason, casts doubt on the IV–D client's claim (e.g. repeated claims of illness, lack of child care, etc.).

If the client provides verification, do not delete the client.

Clients who provide a valid reason for not cooperating are *not* to be deleted from the assistance unit. If the client provides a valid reason after being deleted, the caseworker adds the client to the assistance unit, and assistance is authorized back through the effective date of the deletion.

Issue any back benefits as a correction of an underpayment.

If the client does not claim a valid reason for not cooperating or the reason given is not found valid, the CGRT (Cook) or the caseworker (Downstate) deletes the client from the assistance unit. The CGRT attaches a copy of Form DPA 1611A or DPA 1611B to the Form DPA 157NC, when advising the client of the intended deletion action. Downstate caseworkers are to attach a copy of Form DPA 1611, to Form DPA 157 sent to the client. If the deleted client is willing to cooperate in support enforcement, the caseworker contacts the OFR Coordinator. The OFR Coordinator phones the IV–D contact person and BCSE provides the client an opportunity to cooperate in support enforcement, as soon as possible. If the client failed an appointment with the Family Support Specialist, a new appointment is scheduled as soon as possible, but no later than three weeks from the date the OFR Coordinator reported the client as willing to cooperate to BCSE. Upon receipt of Form DPA 493, Change in Case/Responsible Relative Status, indicating the date the client cooperated with BCSE, the caseworker adds the client to the assistance unit. Authorize assistance from the date of cooperation shown on Form PDA 493.

If the client fails the new appointment or opportunity to cooperate, the client remains deleted from the assistance unit unti he/she demonstrates cooperation. (See PO/PR 500.3d and the 10–26–84 Policy Memorandum).

Future CSE and AFDC Manual Releases will be issued regarding Attestation and Valid Reasons.

/s/ GREGORY J. COLER
DIRECTOR

Forms referenced:
DPA 157
DPA 157NC
DPA 493
DPA 1067
DPA 1611
DPA 1611A
DPA 1611B